EXCHANGE NATIONAL BANK OF CHICAGO, Plaintiff-Appellant, *v.* MELVIN DeGRAFF *et al.*, Defendants-Appellees.

First District (5th Division)  No. 81—0285

Opinion filed September 29, 1982.—Rehearing denied November 17, 1982.

Carmel, Baker & Marcus, Ltd., of Chicago (James E. Carmel and Randall A. Spencer, of counsel), for appellant.

Howard M. Hoffman, John P. C. Duncan, and Norman Hanfling, all of Chicago (Holleb & Coff, Ltd. and Swanson, Ross, Hanfling & Block, of counsel), for appellees.

JUSTICE WILSON delivered the opinion of the court:

Plaintiff, Exchange National Bank of Chicago (Bank), appeals from a judgment entered against it upon a jury's verdict that found defendants not personally liable for certain loan guarantees. The Bank

contends that: (1) the trial court erroneously admitted parol evidence regarding conversations between the parties prior to defendants' execution of the guarantees; (2) the trial court erroneously permitted cross-examination of a Bank officer regarding his alleged conflict of interest in the corporate debtor; (3) the trial court erred in giving certain jury instructions over plaintiff's objections; (4) the trial court erred in refusing to direct a verdict against defendants; and (5) the trial court erroneously disqualified a witness without conducting a hearing. Defendants cross-appeal for certain expenses and attorney fees. We reverse the judgment and remand the cause for a new trial because we find that several jury instructions were improperly given.

The pending litigation concerns the liability of defendants Melvin DeGraff, Burton Kaplan, and Anthony Corso, as guarantors of the Bank's loans to Tulane Industries. Defendants were shareholders of Tulane, which was dissolved in 1974.

According to the parties' stipulations, Tulane Industries, Inc., was organized on or about March 28, 1972. Defendants signed certain guarantee forms furnished by the Bank, which initially extended credit to Tulane on November 1, 1972, in the amount of $60,000. Defendants identified their signatures on the printed forms, which they said were exact copies "in their present condition," but denied that the copies of the guarantees were in the same condition as when they were signed. The stipulation further stated that the initial $60,000 loan had been repaid, as had eight others in varying amounts over a period of time from January 1973 to September 1973. Four loans to Tulane remained outstanding at the time the stipulation was adopted, totalling over $137,000 in principal and $79,500 in interest, which was accruing at the rate of $39.54 per day. In December 1974, the Secretary of State dissolved Tulane.

According to testimony adduced at trial, Tulane Industries in 1971 was a dormant company that Simon Bernstein had organized. He met Richard Curtis, a businessman who had developed and sold several hundred laundromat facilities in several States. The two men agreed to activate Tulane as a company that would develop and sell laundromat facilities at various locations. Tulane would sell equipment to the laundromats, but once they were in operation, separate partnerships would be formed to buy the facilities and Tulane would not own or operate them. In addition to Bernstein and Curtis, the other shareholders in Tulane were Burton Sapoznick and Samuel Beglin, not parties to this appeal, and defendants DeGraff, Kaplan, and Corso.

At its inception, the assets of Tulane included an airplane, approximately $100,000 in cash, and some laundry equipment. To obtain fur-

ther operating capital, DeGraff arranged a meeting between Curtis, Tulane's president, and Henry Hindin, one of the Bank's vice presidents. DeGraff, a certified public accountant, knew Hindin as a client of DeGraff's accounting firm. Hindin's duties included bringing new business to the Bank. Hindin introduced Curtis to Bruce Hepner, a loan officer at the Bank, who handled the Tulane account from 1972 until he was notified that the corporation would be unable to make further payments.

Hepner testified that after a brief meeting with Curtis, he met with DeGraff, Curtis, Corso, and possibly Kaplan and Hindin in the latter part of 1972. Others were present at the meeting, but Hepner could not recall specific names. At this meeting the loan to Tulane was discussed. Regarding the guarantees, Hepner testified that he could only recall someone asking him if the guarantees could be limited and he replied in the negative. Hepner identified the guarantee forms signed by defendants and stated that he gave out blank forms at the meeting. Although he did eventually receive signed and completed forms from defendants, he was unsure as to the dates that he received the forms. He thought Corso's had been completed and returned during the meting. Hepner also admitted that in his deposition he had testified that he did not specifically recall when the guarantees were actually received by the Bank and that it was possible that some of them may have been received after the Bank disbursed the initial loan to Tulane. Hepner further testified that in 1972, the Bank did not have a separate printed form for limited guarantees. If the Bank agreed to grant a limited guarantee, the regular form would be given to in-house counsel for inclusion of the necessary wording.

Defense witnesses testified as follows. Curtis related that he and DeGraff met with Hepner and Hindin at the Bank in late 1972 to discuss the Tulane loan. Hepner advised that the loan would be approved if the shareholders agreed to guarantee the loans. DeGraff told Hepner that he lacked authority to accept on behalf of the other shareholders but that he would discuss the matter with them and report back to the Bank.

Shortly thereafter, the Tulane shareholders met. Present were Curtis, DeGraff, Kaplan, Corso, Sapoznick, and Bernstein, via a speaker phone. Hindin was also present during part of the meeting. At this meeting, it was suggested that the shareholders provide guarantees limited to their pro-rata stock ownership. Alternatively, it was suggested that if the Bank did not find the pro-rata proposal acceptable, they would agree to guarantee a maximum of $60,000 aggregate, to cover the first loan. According to DeGraff's testimony at

trial, Hindin was present during these discussions and, when asked for his opinion, told them to present their proposals to the Bank. The other shareholders agreed to these alternatives and directed DeGraff and Curtis to present them to the Bank.

In a subsequent meeting with Hepner, DeGraff, Curtis and Corso, Hepner rejected the pro-rata suggestion but agreed to accept the $60,000 limitation. Further, Hepner stated that any future loans to Tulane would be made upon the financial strength of the corporation.

All three defendants testified as to their understanding that their personal aggregate liability was limited to a maximum $60,000 of total corporate indebtedness. All three signed the forms in blank; that is, they testified that when they returned the forms, nothing except their signatures was written on the guarantees. Curtis testified that he returned his form in November, after the initial loan had been disbursed. Kaplan testified that he authorized Curtis to return his signed form to the Bank with the express understanding that his liability would be limited to $60,000. DeGraff testified that he did not sign his form until December of 1972 or January of 1973, but that Hepner had asked him to backdate the form to November 1, the date of the first loan. Corso testified that he signed his form several weeks after November 1, 1972, although the form bears that date. He also testified that Hepner told him personally that his liability under the guarantee would be limited to $60,000.

Defendants also introduced into evidence two standard bank confirmation inquiry forms relating to Tulane's account status at the Bank as of July 31, 1973, and December 31, 1973. The July inquiry indicated that the loans then outstanding were unsecured. The December inquiry indicated that Tulane's loan liability as of that date was secured by a life insurance policy. Neither inquiry referred to any guarantees. According to Hepner's testimony, a guarantee was considered to be a form of security for a loan. A 3-year employee of the Bank, George Krumm, identified the Bank inquiry forms as having been completed under his supervision.

Plaintiff called Henry Hindin to testify in rebuttal and moved to bar any cross-examination regarding his investment in partnerships created by Tulane Industries. Hindin testified that he did not remember introducing defendants to Hepner, but stated that it was possible that he had. He also denied participating in any discussions of loans to Tulane in 1972. The court denied plaintiff's motion to bar cross-examination regarding Hindin's interest in four of the laundromats developed by Tulane and Hindin admitted that he did not disclose his interests to the Bank on the disclosure forms he was required to

complete. He denied any conflict of interest or wrongdoing. He also said that the Bank's in-house counsel agreed that he had done nothing wrong in investing in the laundromats.

Both sides moved for a directed verdict and the court reserved its ruling. After a lengthy instruction conference and closing arguments, the jury returned its verdict in favor of defendants.

OPINION

## I

In its motion *in limine* to exclude certain evidence, the Bank urged the trial court to construe the signed forms as the final and complete expression of the contracts of guarantee. The Bank's printed forms include the following language and blanks:

"CONTINUING GUARANTEE

FOR VALUE RECEIVED and in consideration of advances, credit, or other financial accommodation concurrently herewith being afforded or hereafter to be afforded to ..............
.................................... (hereinafter called the 'Debtor'), by EXCHANGE NATIONAL BANK OF CHICAGO, or its successors or assigned (hereinafter called the 'Bank'), the undersigned hereby guarantees the full and prompt payment to the Bank at maturity and at all times hereafter of all indebtedness, obligations and liabilities of every kind and nature of the Debtor to the Bank (including all indebtedness, obligations and liabilities of partnerships, created or arising while the Debtor may have been or may be a member thereof), howsoever evidenced, whether now existing or hereafter created or arising, direct or indirect, absolute or contingent, or joint or several, and howsoever owned, held or acquired, whether through discount, overdraft, purchase, direct loan or as collateral, or otherwise; and the undersigned further agrees to pay all expenses (including court costs and attorneys' fees), paid or incurred by the Bank in endeavoring to collect such indebtedness, obligations and liabilities, or any part thereof, and to enforce this guaranty.

*** 

The undersigned's liability hereunder shall in no wise be affected or impaired by any of the following (any or all of which may be done or omitted by the Bank without notice to any one and irrespective of whether the guaranteed debt shall be increased or decreased thereby), namely: (a) any acceptance by

the Bank of any security or collateral for, or other guarantors or obligors upon, any guaranteed debt; (b) any compromise, settlement, surrender, release, discharge, renewal, extension, alteration, exchange, sale, pledge or other disposition of, or substitution for, or indulgence with respect to, or failure, neglect or omission to realize upon, or to enforce or exercise any liens or rights of appropriation or other rights with respect to, any guaranteed debt or any security or collateral therefor or any claims against any person or persons primarily or secondarily liable thereon; (c) the granting of credit from time to time by the Bank to the Debtor in excess of the amount, if any, to which the right of recovery under this guaranty is limited; or (d) any act of commission or omission of any kind or at any time upon the part of the Bank with respect to any matter whatsoever, other than the execution and delivery by the Bank to the undersigned of any express written release or cancellation of this guaranty.

\*\*\*

SIGNED AND DELIVERED by the undersigned, at Chicago, Illinois, this _____ day of _____, 19\_\_\_\_

_____ ,,

Plaintiff argues that the trial court violated the parol evidence rule by erroneously admitting evidence of prior negotiations between the parties. According to defendants' testimony, the Bank loan officer, Hepner, agreed to the $60,000 limitation on the shareholders' liability for the corporate indebtedness. Plaintiff contends, however, that this testimony should not have been admitted because the signed guarantee forms are facially complete, unlimited and unconditional. Consequently, defendants' evidence of the limitation impermissibly contradicted the terms of the instrument.

In response, defendants raise several grounds to justify the admission of the evidence. Initially, they argue that plaintiff has waived the issue. We disagree, however, because plaintiff made a motion _in limine_ to exclude the extrinsic evidence relating to the guarantees. Therefore, the Bank preserved its objection to the introduction of the extrinsic evidence. We do agree with defendants, however, that the trial court did not abuse its discretion in admitting the testimony. Defendants' primary theory is that the guarantees never became binding contracts because their effectiveness was conditioned on the Bank's agreement to limit the guarantees to $60,000; thus, the Bank's failure to complete the forms in accordance with the agreement prevented defendants' liability from ever arising.

Under plaintiff's formulation of the parol evidence rule, the printed guarantees would presumptively be the final, complete, and unambiguous expression of the parties' intent. Based on that presumption, evidence of a prior or contemporaneous agreement would be inadmissible to vary the terms of the written agreement. (38 Am. Jur. 2d *Guaranty* sec. 124 (1968).) To determine whether the written document was the final, integrated expression of the parties' agreement, the court would refer only to the instrument itself. *Cargill Commission Co. v. Swartwood* (1924), 159 Minn. 1, 198 N.W. 536.

Other courts, recognizing that a written instrument is not self-proving, consider any relevant evidence surrounding the creation of the document, to initially determine whether the parties *intended* the writing to be the final or integrated expression of their agreement. (Restatement (Second) of Contracts sec. 209 (1981).) Under the Restatement rationale, where a writing appears complete and specific, it will be considered integrated unless it is established by other evidence that the writing did not constitute a final expression. (Section 209(3).) This preliminary determination of whether it is integrated, moreover, is for the court to decide, separate from questions of interpretation of applicability of the parol evidence rule. Section 209(2). See also sections 213 and 215.

In *State Bank v. Cirivello* (1978), 74 Ill. 2d 426, 386 N.E.2d 43, the Illinois Supreme Court implicitly rejected the "face of the instrument" test in favor of allowing testimony that a guarantee, seemingly complete and unconditional on its face, was not to take effect unless and until all 13 co-partners of a limited partnership agreed to be guarantors for a bank loan. The plaintiff bank had filed an action against certain of the partners, 12 of whom had signed the guarantees and delivered them to the bank. The forms did not contain any limitation or condition regarding the requirement that *all* co-partners sign guarantees. The court said that a "condition becomes a part of the guaranty if it is known and agreed upon by the parties." (74 Ill. 2d 426, 431, 386 N.E.2d 43, 45.) The court further noted that such a conditional guarantee contemplates, as a condition precedent to the signor's liability, the happening of some contingent event.

In *State Bank*, as in the present case, the signed forms were facially unconditional and, if given effect, would have made all who signed liable, jointly and severally, for the entire obligation. By analogy, we find that defendants in the pending case were properly allowed to offer evidence that the instruments they signed were incomplete, not the fully integrated contracts that plaintiff asserts.

In *Main Bank v. Baker* (1981), 86 Ill. 2d 188, 199, 427 N.E.2d 94,

the court enumerated several situations in which the parol evidence exclusionary rule does not apply, stating that:

"In some circumstances parol evidence may be considered to aid in the interpretation of a contract (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283; 9 Wigmore, Evidence sec. 2470 (3d ed. 1940)), and such evidence may be admissible to invalidate a contract under certain circumstances (*e.g., State Bank v. Cirivello* (1978), 74 Ill. 2d 426 (incomplete instrument); *Bell v. McDonald* (1923), 308 Ill. 329 (conditional delivery); *Van Buskirk v. Day* (1863), 32 Ill. 260 (fraud); Restatement of Contracts sec. 238 (1932)), but parol evidence is otherwise inadmissible to vary or contradict the clear written provisions of an integrated contract (*Kendall v. Kendall* (1978), 71 Ill. 2d 374; *Scholbe v. Schuchardt* (1920), 292 Ill. 529; Restatement (Second) of Contracts secs. 239, 241 (Tent. Draft Nos. 1 through 7 (1973))."

In *Fisk Tire Co. v. Burmeister* (1929), 252 Ill. App. 545, a situation strikingly analogous to the present case, defendant agreed to guarantee payment for another's purchase. Defendant testified at trial that she and plaintiff had agreed to limit her liability to $400. She signed a blank, "unconditional" guarantee form and returned it to plaintiff. The limitation was never inserted anywhere on the guarantee. In rejecting plaintiff's argument that the parol evidence rule barred admission of the limitation testimony, the court held that the rule did not apply where the guarantee had not been properly completed in accordance with the parties' agreement. Thus, the guarantee contract never became effective and defendant was not liable for even the $400 amount that she had originally agreed to pay.

After the reasoning of *Fisk* and *Cirivello*, we conclude that the trial court properly admitted evidence of the parties' intention.[1] It was then for the jury to weigh all the evidence and determine whether a contract actually came into existence.

---

[1] Plaintiff relies on *National Bank & Trust Co. v. Becker* (1962), 38 Ill. App. 2d 307, 187 N.E.2d 355, for the proposition that to come with the parol evidence rule an alleged oral limitation on a written guarantee must qualify as a condition precedent rather than a condition subsequent. The court then, in effect, defined any condition which "violates" the terms of the contract as a condition subsequent. (38 Ill. App. 2d 307, 312.) Section 217 of the Restatement (Second) of Contracts (1981), however, explains that "[w]here the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition." Comment (b) to the section explains that this rule has sometimes been limited to oral conditions consistent with the written terms, but in actuality, an oral requirement of a condition is *never*

## II

Plaintiff next contends that jury instructions Nos. 1, 12, 14A, 14B, 15, and 16 were erroneously given because they are either argumentative and unduly emphasized certain matters favorable to defendants, or are incorrect as a matter of law. We agree that some of the instructions should not have been given, and base our reversal on this issue.

Initially, we note that the parties properly submitted Illinois Pattern Jury Instructions when feasible. Since there exist no specific pattern instructions based upon contracts of guarantee, the parties drafted several. According to Supreme Court Rule 239 (73 Ill. 2d R. 239), such instructions "should be simple, brief, impartial, and free from argument."

Instruction No. 16 provides as follows:

"If you find that a Defendant agreed to guarantee a portion of the obligations of Tulane Industries, Inc. to the Exchange National Bank, but that the Exchange National Bank, upon receipt of that Defendant's signed guarantee form, materially altered it in a manner not in conformity with its agreement with such Defendant, then such Defendant is not liable to the Plaintiff, and you will have no occasion to consider the question of damages."

Plaintiff's objection to this instruction is twofold. First, the question of material alteration only pertains to one guarantee, that of De-Graff. Second, the materiality of an alteration on a document raises a question of law to be decided by the court rather than the jury.

We agree that this instruction is improper. Corso's signed form contained no alteration and Kaplan's form merely indicated that the day of the month it was signed may have been marked over. Kaplan testified that he signed the form "sometime" in December of 1972 and that, looking at the form, the date appeared to be either the 13th or 18th of that month. We are unable to discern the remotest significance of this alteration, if that is what it is. Defendants do not explain how the change of a date from the 13th to the 18th bears on the parties' rights or obligations, a necessary prerequisite to the finding that an "alteration" is "material." See *Ruwaldt v. W. C. McBride,*

completely consistent with a signed, written agreement which is complete on its face. In such cases, evidence of the oral requirement bears directly on the issue of whether the parties adopted the writing as an integrated agreement. Inconsistency, thus, is merely one factor in the preliminary determination of whether and to what extent the written document is integrated.

*Inc.* (1944), 388 Ill. 285, 57 N.E.2d 863.

■ The only form on which an arguably material alteration was made is that of defendant DeGraff. In the top of the form, in the blank for the debtor's name, is printed "Melvin DeGraff." A single line is drawn through his name and the name of the actual debtor, Tulane Corporation, is written in. Defendants argue that this is indicative of a material alteration because the substitution of one debtor's name for another in a guarantee contract substantially affects the rights and obligations of the parties. While we agree that in the abstract, such an alteration could be classified as material, we are not persuaded that the name substitution has any substantial effect in this particular case. The purpose of a guarantee is for one person to answer for the debt of another; clearly, the entry of Melvin DeGraff's name as debtor on Melvin DeGraff's guarantee would be meaningless. The corporation's debt was the undisputed object of the defendants' personal guarantees, and the above-mentioned alteration can only be viewed as the correction of a clerical-type error.

■ We conclude that an instruction on material alteration was incorrectly given because the elements of such a defense are not supported by the evidence; consequently, such an instruction could well have led to jury confusion. Defendants' major theory of the case, that the guarantees never became effective because they were not completed in conformance with the parties' agreement, was adequately covered in another instruction. Because the material alteration instruction injected a collateral and unsupported alternative theory into the case, it constitutes reversible error.

Instruction No. 14A provided that:

> "Taken as a whole, the terms of the written guarantee in this case are not inconsistent with the possible existence of an oral agreement to limit the amount of the indebtedness of the guaranteed."

■ Plaintiff objected to this instruction on the ground that it suggests to the jury that such an oral agreement did, in fact, exist, and therefore, it is argumentative of defendants' theory of the case. We agree that it is inappropriate and confusing. As a partial statement of the parol evidence rule, it may be accurate, but since the trial court had preliminarily ruled that the extrinsic evidence was admissible, we do not comprehend how this instruction could aid the jury's deliberations. Although this instruction, standing alone, might not constitute reversible error, we conclude that it is confusing and should not be given upon retrial.

We also agree with plaintiff that instruction No. 14B was errone-

ously given. That instruction provides:

> "If you decide that plaintiff was not relying upon defendant's guarantees in making all or some of the loans to Tulane Industries, which may still be outstanding, you may infer that there were no guarantee agreements then in effect or that any guarantee agreement then in effect was limited in amount."

Lengthy discussion in the transcript indicates that the significance of the Bank's "reliance" on the defendants' guarantees was sharply contested. Plaintiff's main objection to the instruction is that it improperly engrafts an extra element of reliance onto the law of guaranty. Defendants counter that the Bank's conduct in lending Tulane money without reliance on the guarantees is evidence of their "practical construction" of the agreements.

■ The cases cited by defendants accurately state that parties' actions are relevant to their own intent or understanding of their agreement, which can then be considered in the judicial construction of the contract. (See *Occidental Chemical Co. v. Agri Profit Systems, Inc.* (1975), 37 Ill. App. 3d 599, 346 N.E.2d 482.) We acknowledge that defendants adduced some evidence tending to show that plaintiff may have tendered loans to Tulane without regard to the efficacy of the guarantees. One inference from such evidence is that the Bank did not rely on the guarantees because it did not believe that they were binding. On the other hand, the jury might have inferred that the Bank believed that the guarantees were validly executed and enforceable at any time without a showing of actual reliance on them. We believe that the matter of the Bank's "reliance" on the guarantees, while relevant and admissible, should not have been the subject of a separate instruction for the jury. As worded, it tends to direct the jury to draw the inference favorable to defendants. As such, it is argumentative. The Illinois Pattern Jury Instructions were drafted to avoid instructions that emphasize one particular evidentiary issue over others. See Foreward to Illinois Pattern Jury Instructions, Civil, at VI (2d ed. 1971).

Next, plaintiff challenges the instructions Nos. 1 and 12, which concern agency principles and apparently were submitted because of defendant Kaplan's lack of direct contact with the Bank or Bank representatives. Instruction No. 1 states:

> "An agent is the person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts business, manages some affairs or does some service for the principal, with or without compensation. The agreement may be oral or written, expressed or implied.

An agent may by his words and actions only bind his principal as to matters and to the extent that he has been given expressed or implied authority to do so by his principal."

Instruction No. 12 recites, in pertinent part, as follows:

"**** if the plaintiff contracted with an agent or any defendant, then the plaintiff has the burden of proving that the agent was in fact an agent of the particular defendant, and had the authority to contract with the plaintiff on the specific terms claimed by the plaintiff."

■ Although plaintiff does not seriously dispute the general accuracy of the law reflected in instruction No. 1, plaintiff argues that instruction No. 12 imposes upon it the unfair burden of proving a "secret understanding" between Kaplan and the other defendants, which was never communicated to the Bank. We do not believe, however, that plaintiff's objection is well taken. The evidence supports the inference that DeGraff and Curtis were acting on behalf of the other shareholders following the meeting in late 1972 when they agreed to undertake a limited guarantee and directed Curtis and DeGraff to report back to the Bank. Kaplan testified that he gave his guarantee to Curtis to give to the Bank upon the understanding that his liability was limited to the $60,000, as agreed in the shareholder meeting. The Bank did not offer any rebuttal to defendants' evidence that the Tulane shareholders dealt with the Bank essentially as a group, rather than as individuals. It is not disputed that DeGraff and Curtis took the active role in the loan transaction and in effect, represented the other shareholders. Nor is it argued that the Bank would have had to explain the guarantees to each defendant, in person, for them to be binding. Hence, the question of agency is not really a major disputed issue in the case. Possibly, instructions Nos. 1 and 12 are superfluous. Nevertheless, for the Bank to enforce the guarantee contract against Kaplan, part of its burden of proof would be to establish, if it did not deal directly with him, that it contracted with his agent, who acted with express or apparent authority to represent him. Since the apparent authority of Curtis and DeGraff was established in the defendants' evidence, the Bank did not have to actually prove that element. Accordingly, the submission of the agency instructions may have been confusing and should not have been given. We do not believe, however, that they are incorrect statements of law or that they substantially prejudiced plaintiff, who, of course, retained the ultimate burden of persuasion throughout the trial.

Plaintiff's final objection to jury instructions is aimed at No. 15, which provides:

"If you find that a defendant agreed to guarantee a portion of the obligations of Tulane Industries Inc. to the Exchange National Bank, but that the Exchange National Bank, upon receipt of that defendant's signed guarantee form failed to complete the form in accordance to the terms of its agreement with such defendant as to the amount of obligations guaranteed, then such defendant is not liable to the plaintiff and you will have no occasion to consider the question of damages."

As we indicated in our discussion of instruction No. 16 on material alteration, defendants were entitled to an instruction on the effect of the Bank's failure to complete the written guarantee in accordance with the parties' agreement but not on the question of material alteration. The above instruction is a proper statement of law and we do not find it to be argumentative. Plaintiff, however, argues that it precludes the jury from finding that defendants were liable for at least $60,000 and that the trial court erred in refusing to direct a verdict in that amount against all defendants.

■ After arguing persistently throughout pretrial motions and trial and closing arguments that there was never an agreement to limit the amount of the written guarantees, plaintiff wants to change its position and have a verdict directed in the amount of $60,000 based on that agreement. Defendants' admissions, in this case, were part of their defense that no legally binding contract of guarantee ever came into being because of the Bank's failure to complete the documents as agreed. Under the rule stated in *Fisk*, defendants would not be liable for the $60,000 amount because of the failure of the condition precedent to the contract to ever be satisfied, without which defendants' obligations to pay never arose. We conclude that instruction No. 15 was properly given and that the trial court did not err in refusing to direct verdicts.

### III

■ In view of our decision to reverse the judgments and remand for a new trial, we will not discuss the other issues raised in detail. One issue that may recur, however, needs brief mention. Plaintiff contends that the trial court erred in allowing defendants to elicit certain evidence from Henry Hindin, which was offered for impeachment on the basis of possible bias. After reviewing the record and the arguments pertinent to this issue, we hold that the trial court did not abuse its discretion. When plaintiff first moved to bar testimony relating to Hindin's alleged failure to disclose to the Bank a possible conflict of interest in his dealings with laundromats developed by Tulane,

the trial court reserved its ruling until the matter came up in issue at trial. Eventually plaintiff called Hindin as a rebuttal witness, to deny that he was present during the discussions involving the loans to Tulane. Defendants then cross-examined Hindin regarding his failure to disclose his laundromat interests to the Bank. Plaintiff argues that the attempted impeachment was not material and should have been excluded. We disagree. Once Hindin testified for plaintiff, defendants were entitled to cross-examine him without undue restrictions. The circumstances surrounding his nondisclosed investments in the laundromats, we believe, were proper subjects to explore on cross-examination. The trial court was aware of plaintiff's objection based on relevancy but ruled in favor of the admissibility of the testimony. The weight to be given the evidence was properly for the jury to determine and we conclude that the court did not err in its ruling.

## IV

The final issue for our consideration is defendants' cross-appeal for certain expenses and attorney fees. The basis for their claim is that prior to trial they submitted requests to plaintiff to admit facts. Plaintiff denied some of the requests and defendants now argue that they established the truth of those matters at trial. Accordingly, they contend, the trial court erroneously denied their request for expenses and fees pursuant to Supreme Court Rule 219(b) (73 Ill. 2d R. 219(b)), which provides:

> "Expenses on Refusal to Admit. If a party, after being served with a request to admit the genuineness of any documents or the truth of any matters of fact, serves a sworn denial thereof, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter of fact, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred in making the proof, including reasonable attorney's fees. Unless the court finds that there were good reasons for the denial or that the admissions sought were of no substantial importance, the order shall be made."

Focusing on the wording and implicit policy of the rule, which is to simplify litigation and promote settlement, defendants underscore three criteria upon which a trial court must base its order for expenses and fees under the rule: (1) the moving party's proof of the truth of the matters asserted which were denied by the respondent; (2) lack of respondent's good reasons to deny the facts; (3) substantial importance of the matters as to which the admissions were sought. If

these criteria are established, defendants maintain, the trial court is mandated to award expenses and fees.

Defendants concede that they could not discover any cases arising under this rule and delineating the standards for determining whether facts have been proven. They also acknowledge that it is not feasible to rely solely on the jury's general verdict as automatic "proof" that the denied matters were true. They argue, however, that the trial court must consider all relevant factors and then determine whether each denied request to admit was proven true.

■■■ Defendants present a lengthy, complicated rationale for our reversal of the trial court's order denying their fees and expenses under Rule 219(b). In examining these eight requests to admit, however, we do not conclude that the trial court erred. The requests in issue are as follows:

> *"Request to Admit No. 5*: At the time that the document *** was executed by BURTON KAPLAN in its original form and delivered to Plaintiff, BURTON KAPLAN intended that his liability thereunder to Plaintiff not exceed $60,000.
> *Request to Admit No. 13*: (Identical to No. 5, except that it referred to the guarantee signed by DE GRAFF.)
> *Request to Admit No. 6*: At the time the document *** was executed by BURTON KAPLAN in its original form and delivered to Plaintiff, the EXCHANGE NATIONAL BANK OF CHICAGO intended BURTON KAPLAN's liability thereunder to Plaintiff not exceed $60,000.
> *Request to Admit No. 14*: (Identical to No. 6, except that it refers to DE GRAFF.)
> *Request to Admit No. 9*: The document entitled 'continuing guarantee', at the time it was signed by Melvin DeGraff did not bear the handwritten words 'Tulane Corporation'.
> *Request to Admit No. 10*: The document entitled 'continuing guarantee', *** at the time it was delivered to Plaintiff did not bear the handwritten words 'Tulane Corporation'.
> *Request to Admit No. 11*: The original document entitled 'continuing guarantee' and executed by Melvin DeGraff *** was first received by Plaintiff on or after January 3, 1973.
> *Request to Admit No. 12*: Melvin DeGraff's signature was affixed to the document, *** in January of 1973."

Request Nos. 5 and 13 ask the Bank to admit defendants' intent as to the limitation of their liability under the guarantees. Nos. 6 and 14 ask the Bank to admit its own intent to limit the guarantees. Plaintiff's case against defendants is based on its possession of

signed, facially unlimited guarantees and Hepner's testimony that he did not approve any limitation proposals. Therefore, the Bank's admission of these four requests would be conceding away its whole case. Plaintiff's duty to admit facts surely does not extend to accepting defendants' version of the parties' actual intent with respect to the guarantees. The jury's verdict in favor of defendants does not necessarily mean that defendants proved that the parties intended to limit the guarantee; in fact, had the jury found defendants liable for $60,000, the "proof" of these requests might appear stronger. Nevertheless, Rule 219(b) requires, in addition to proof of the matters asserted, that the denying party lacked good reasons to deny. We do not find unreasonable the Bank's reliance on the signed guarantee forms and its loan officer's testimony.

Requests Nos. 9 and 10 appear to lack substantial importance because it is undisputed that Tulane is the debtor for whom defendants were willing to sign guarantees. Plaintiff does not necessarily dispute defendants' testimony that the guarantees were signed and delivered in blank, and under either party's theory of the case plaintiff had authority to fill in the name of the debtor. It is plaintiff's alleged failure to complete the form in accordance with the parties' agreement that is of primary importance, not who wrote in the debtor's name and when.

Requests Nos. 11 and 12 ask for the admission of specific dates which might not have been within plaintiff's recollection. Indeed, Hepner's testimony at trial was that he did not recall the actual dates that the documents were received by the Bank. The documents themselves do not reflect the January 1973 dates. Even if it is assumed that defendants' testimony proved the delivery dates for purposes of Rule 219(b), we do not find it unreasonable for the Bank not to admit the truth of that which it could not recall.

Rule 219(b) does not qualify or explain the type of factual matters that come within its scope. As a discovery rule, however, the rule applies most logically to matters within the denying party's control or knowledge which may be subsequently verified by independent sources, as for example, a party's income or the existence of a cloud on a party's real estate title. If one party unreasonably denies such facts under oath, the opposing party should be able to recover expenses and fees expended in proving them. If the rule is extended to all controverted matters which become "proven facts" only through a general verdict or judgment, the prevailing party to an action would presumably be allowed to recover fees and expenses routinely. We do not believe this is the intent of Supreme Court Rule 219(b).

In the pending case, notwithstanding the problems of ascertaining whether each requested admission was in fact proved, we conclude that the requests were denied for good reasons. Consequently, we affirm the trial court's denial of defendants' petition for expenses and fees.

For the reasons herein discussed, we reverse the trial court's judgment on the jury's verdict and remand the cause for a new trial. Further, we uphold the denial of cross-appellants' expenses and attorney fees under Supreme Court Rule 219(b).

Reversed in part, affirmed in part, and remanded.

LORENZ and MEJDA, JJ., concur.