First Division
June 29, 2007

No. 1-05-3686

| | | |
|---|---|---|
| FIRST NATIONAL BANK OF LAGRANGE, Guardian of the Estate of Jordan King, a Minor, by Mary Urbik King, his Mother and Next Friend, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Plaintiff–Appellee and Cross–Appellant, | ) ) | |
| | ) | |
| v. | ) | 02 L 6640 |
| | ) | |
| JOHN J. LOWREY, and LOWREY AND SMERZ, | ) | |
| | ) | |
| Defendants–Appellants and Cross–Appellees. | ) ) | Hon. Richard J. Elrod, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Defendants–appellants, John J. Lowrey and Lowrey & Smerz, appeal from a final judgment entered by the circuit court of Cook County in favor of plaintiff–cross-appellant, First National Bank of LaGrange, guardian of the estate of Jordan King, a minor, by Mary Urbik King, his mother and next friend, following a jury trial. Defendants originally represented the plaintiffs in an underlying medical malpractice action to recover damages for injuries that Jordan suffered at birth. Following a jury trial in that case, judgment was entered against plaintiffs and in favor of defendants. This court affirmed that judgment on direct appeal. *First National Bank of LaGrange v. Loyola University of Chicago*, No. 1-97-2963 (1999) (unpublished order pursuant to Supreme Court Rule 23). Plaintiff subsequently filed suit against defendants for legal malpractice, alleging that defendants failed to inform Jordan's mother, Mary King, of a $1 million settlement offer in the medical malpractice case. Following a trial, the jury found against defendants and awarded plaintiff $1 million.

1-05-3686

Defendants appeal, contending that the trial court erred by denying their motion for a directed verdict, by denying their motion for judgment notwithstanding the verdict (judgment *n.o.v.*), and by denying their motion for a new trial. Plaintiff cross-appeals from the trial court's denial of her posttrial motions for prejudgment interest and for costs and attorney fees. For the reasons that follow, we affirm.

Jordan King was born on October 1, 1990. As a result of physical and mental injuries suffered at birth, Jordan's parents (Mary and Donald, who is now deceased) retained John Lowrey to investigate Jordan's injuries and pursue legal recourse. Lowrey subsequently filed a medical malpractice action against Jordan's doctor and Loyola University Medical Center.

On October 28, 1996, the medical malpractice case was assigned to Judge Maddux. On that day, Judge Maddux held a conference in chambers with the attorneys, during which the medical malpractice defendants offered to settle the case for $1 million. Lowrey subsequently rejected defendants' offer (the circumstances surrounding when and how the offer was rejected are the subject of this litigation). The case proceeded to trial and while the jury was deliberating, Lowrey proposed a "high-low" settlement offer to defendants of between $3 million and $10 million. The medical malpractice defendants did not respond to this proposal, and the jury ultimately returned a verdict in favor of defendants.

Six months after the jury returned a verdict, Lowrey sent Mary a contingent fee contract for her signature. Signing the contract would have obligated Mary to pay Lowrey for his costs and expenses from the medical malpractice case. Mary did not sign the agreement.

On May 24, 2002, plaintiff filed a legal malpractice action alleging that defendants rejected

the $1 million settlement without discussing it with Mary. On June 16, 2005, the legal malpractice case was tried before a jury. At the start of the trial, plaintiff's attorney read admitted facts into evidence. The following facts were admitted: Lowrey met with the Kings on or about October 1 or 2, 1990, and accepted the representation of Jordan King at that time, thereby forming an oral contract for legal services; Lowrey's representation of Jordan was on a contingent fee basis; defendants do not have any documents regarding the definition of costs or expenses in any oral contract for delivery of legal services to Jordan King; defendants do not have any documents regarding communications between Lowrey and anyone acting on Jordan King's behalf about the amount of the initial settlement demand in the medical malpractice lawsuit; on October 28, 1996, the defendants in the medical malpractice lawsuit for the first time made a formal settlement offer of $1 million; defendants do not have any documentation communicating this settlement offer to anyone acting on Jordan King's behalf; defendants do not have any documentation regarding Mary's acceptance or rejection of the settlement offer; and defendants do not have a written contingent fee agreement signed by someone acting on Jordan King's behalf.

John Lowrey testified for plaintiff as an adverse witness. Lowrey testified that he either sent the Kings a written contingency fee agreement or left the agreement with the Kings at their apartment. Lowrey did not know what happened to the agreement and acknowledged that he had it in his possession after it was signed by the Kings. He assumed that he gave the Kings the standard form agreement that he used at that time.

Lowrey testified that the written contingent fee agreement contained language which obligated the Kings to repay Lowrey's costs and expenses regardless of the outcome of the

medical malpractice case. Lowrey acknowledged giving a deposition in this case in which he testified that the contract the Kings signed "probably" did not contain language obligating them to repay Lowrey's costs and expenses regardless of the outcome of the case.

Lowrey further testified that the standard form agreement he used at the time of the medical malpractice case contained a paragraph regarding settlement, although he could not recall "the exact words." Lowrey did not remember the contract requiring him to obtain the Kings' written permission before settling the case or rejecting a settlement offer, or specifically stating that he could use his own judgment in negotiating a settlement. However, it was implicit in the agreement that he could use his judgment to negotiate a settlement and that he would then have to talk to the Kings before a settlement was accepted.

Lowrey sent the malpractice defendants a letter on January 17, 1996, in which he made a settlement demand of $8.5 million. Lowrey also sent the malpractice defendants a letter on March 26, 1996, giving them a seven-day limit to propose a settlement offer before Lowrey withdrew his demand for settlement. The medical malpractice defendants responded by sending a letter to Lowrey stating that the seven-day limit was unreasonable but that they wanted to continue discussing settlement.

Lowrey testified that the medical malpractice defendants made a $1 million settlement offer in Judge Maddux's chambers on October 28, 1996, and that he did not reject the offer at that time. When defendants made the settlement offer, Lowrey thought it was a possibility that there was more than $1 million available to settle the case, although he did not believe this was probable. Lowrey acknowledged that he gave a deposition in this case in which he testified that,

prior to trial in the medical malpractice case, he "figured" there might be more than $1 million available to settle the case. Lowrey did not believe that this was important information for Mary to know. Lowrey also stated that the settlement offer did not include a waiver of the $147,000 hospital bill from Loyola because he thought that the bill was paid by insurance.

Lowrey testified that he believed that he rejected the $1 million settlement offer on October 29, 1996, after speaking with Mary on the phone and advising her to reject the offer. Lowrey acknowledged that, in his answers to an interrogatory requesting that he identify all conversations he had with anyone acting on Jordan's behalf regarding accepting or rejecting a settlement offer, he stated that he advised Mary of the $1 million settlement offer "in a face to face meeting" at his office in November 1996. When asked about this discrepancy, Lowrey stated that his interrogatory answers were not complete and that his attorney pointed this out to him the night before he testified.

Lowrey further testified that he owed Mary a fiduciary and a contractual duty to advise her of the $1 million settlement offer before he rejected it and to provide her with sufficient information to make an informed decision regarding a settlement offer. However, he was not obligated to advise Mary of every settlement offer that was made.

During the course of his investigation, Lowrey had a number of experts review the facts of the medical malpractice case. Some of those doctors gave Lowrey "negative reviews" and said that no medical malpractice had occurred. Lowrey acknowledged that he had a duty, "in general terms," to tell Mary of these negative reviews.

Lowrey also testified that he had a discussion with Mary regarding what the amount of his

fee would be in context of the $1 million settlement offer. Lowrey believed that this amount was $262,000, based on the standard contract which entitled him to one-third of the first $150,000 and to 25% of the remaining $850,000. At the time that Lowrey told Mary about the settlement offer, he believed she was contractually obligated to pay him $180,000 in costs regardless of the outcome. Lowrey did not believe that this was important for Mary to know because he never intended to ask her to repay his costs and expenses if they lost the case. However, Lowery did tell Mary the amount of costs that he had incurred. If Mary had accepted the $1 million offer, Lowrey would have taken his costs of between $160,000 and $180,000 out of that amount. Under questioning by the court, Lowrey acknowledged that it might not have been clear to Mary that his fees would be subtracted from the $1 million settlement. During the conversation with Mary in which she rejected the $1 million offer, Mary also told Lowrey to continue pressing with the $8.5 million settlement demand. Lowrey acknowledged that Mary could have accepted the $1 million offer at anytime until the jury returned its verdict, and testified that he conveyed this information to Mary.

Lowrey testified that he sent the medical malpractice defendants a letter on January 17, 1996, in which he listed four issues regarding the case. Lowrey acknowledged that he gave a deposition in this case in which he testified that the letter contained four issues he considered important in evaluating the strength of the medical malpractice case. One of those facts was that Mary's chart contained entries about a football game. Specifically, Dr. Tomich, a defendant in the medical malpractice case, made an entry in Jordan's chart that he was called to the hospital during the third or fourth quarter of the Chicago Bears football game. However, the trial court in the

medical malpractice case granted defendants' motion to bar any reference to those entries. Lowrey stated that he conveyed this ruling to Mary. In the letter, Lowrey also stated that he believed the jury would be given a missing evidence instruction because Mary's placenta was lost after she gave birth to Jordan. The trial court, however, ultimately refused to give the jury the missing evidence instruction. Lowrey did not recall discussing this ruling with Mary.

On December 2, 1996, while the jury was deliberating, Lowrey approached Charles Reiter, who represented the defendants in the underlying medical malpractice case, and proposed a high-low settlement offer of between $3 million and $10 million. Lowrey explained that pursuant to that proposal, plaintiffs would get $3 million if the jury returned a verdict of $3 million or less, and $10 million if the verdict was in excess of $10 million. Plaintiffs would receive the amount of the jury verdict if that verdict was anywhere between $3 million and $10 million. Lowrey discussed the high-low proposal with Mary and had her authority to submit the offer to defendants.

In May 1997, after the medical malpractice case had concluded, Lowrey sent the Kings a written contingent fee agreement for their signature. That agreement was the same agreement that the Kings had signed in 1990, which required the Kings to repay Lowrey's costs and expenses regardless of the outcome of the case. Lowrey did not know why he sent the Kings a contract to sign in 1997 if the Kings had already signed a contract in 1990.

In August 2001, Mary asked Lowrey if she could look at her file. Lowrey responded by sending Mary a letter informing her that she was legally obligated to pay him $160,000 in costs and fees.

Reiter testified that he made a $1 million settlement offer to the medical malpractice plaintiffs on the morning of October 28, 1996. The offer was made in the chambers of Judge Maddux, the judge in the medical malpractice trial. When Reiter made the offer, he assumed that any outstanding hospital bill from Loyola would be "written off." The offer was rejected that same morning in the judge's chambers. Reiter explained that the circumstances surrounding the settlement offer involved the judge holding a conference "where the parties talk to the judge and then the other parties are out of the room and they come back and we all talk together." Reiter believed that the rejection was communicated to him by the court and not by Lowrey, and testified that the court also related that Lowrey was not changing his demand of $8.5 million to settle the case. Reiter conveyed to the judge that he "would not bid against [himself]," which meant that he would not offer more money to settle the case until Lowrey changed his demand. Reiter testified that he never told Lowrey that the $1 million offer was withdrawn and that the offer "remained on the table" throughout trial and could have been accepted at anytime until the jury returned a verdict.

Reiter again spoke to Lowrey regarding settlement on December 2, 1996. The discussion occurred after closing arguments but prior to when the jury returned its verdict. During that conversation, Reiter told Lowrey that he had to make another demand if he wanted to reopen settlement negotiations. Lowrey subsequently proposed the high-low offer to Reiter. Reiter testified that he could not remember if Lowrey made that offer on December 2 or on December 3, the day the jury returned its verdict. The medical malpractice defendants did not respond to the offer, and there were no further discussions regarding settlement. However, the $1 million offer

was still available after Lowrey proposed the high-low offer.

Under examination by defendants, Reiter testified that Lowrey was a talented attorney with a reputation for being an aggressive trial lawyer. Reiter also testified that one of the experts that Lowrey had obtained in the medical malpractice case was Dr. Linke, an economist who attempted to determine the costs of Jordan's future healthcare needs. According to a report prepared by Dr. Linke, the estimated costs of caring for Jordan for the rest of his life were between $3 and $5 million if he continued to live at home and between $4 and $6 million if he was placed in a residential facility.

Reiter further testified under cross-examination that he was concerned that he could lose the medical malpractice case, and that the damages could be in the "10's of millions of dollars." Reiter acknowledged that he did not tell Lowrey that the $1 million offer remained open after it was rejected. At the time that the $1 million offer was made, the trial court had not ruled on the notes in Jordan's chart regarding a football game or whether the jury would be given a missing evidence instruction regarding Mary's lost placenta. However, the offer remained open after the court ruled on these issues, and Reiter characterized the court's eventual rulings on these matters as "better than [good]" for the defendants. Reiter testified that, in 1996, a million dollars was a substantial offer on a case.

Professor Steven Lubet, plaintiff's professional responsibility expert, testified that although he was not an expert in medical malpractice cases, he was an expert in advising medical malpractice lawyers about their ethical obligations. An attorney's professional responsibility or ethics is a field that transcends any particular area of practice, and therefore questions such as

1-05-3686

client confidentiality, adherence to client instructions, and conflicts of interest are universal obligations that every lawyer owes to each client.

Professor Lubet explained that the client is always in charge of the litigation and that an attorney's responsibility is to pursue the client's objectives, as those objectives are determined by the client. Therefore, while there are technical decisions that an attorney is trained to make, there are other decisions that do not depend on training but instead on how much risk the client is willing to take. Those decisions are to be made by the client and include, for example, whether to settle a case.

Professor Lubet testified that attorneys in Illinois are governed by the Rules of Professional Conduct. Rule 1.5 generally covers the manner in which attorneys may handle their fees. Specifically, Rule 1.5(c) (134 Ill. 2d R. 1.5(c)) states that "[a] fee may be contingent on the outcome of the matter." However, in order to protect the client, a contingent fee agreement must be in writing and must include certain information such as the method by which the fee is to be determined and the attorney's costs and expenses at the end of the case. Rule 1.4 (134 Ill. 2d R. 1.4) requires an attorney to keep a client reasonably informed of the status of a matter and to provide the client with the information necessary to make an informed decision regarding the representation. Rule 1.2 (134 Ill. 2d R. 1.2) deals with the scope of the representation and requires an attorney to abide by a client's decision whether to settle a case.

Lubet testified that a client must always remain ultimately responsible for accepting or rejecting a settlement offer. The reason for this rule is that while attorneys usually have many cases, a client only has one case and that affects the client's ability and attitude toward accepting

risk. Lubet explained that there is always a risk of losing a case when it is taken to trial, and the consequences of losing are much worse for the client than for the attorney. Therefore, while a client can give an attorney a settlement instruction to accept an offer within a certain range and reject anything outside of that range, the client cannot give the attorney the authority to substitute the attorney's judgment for the client's.

Lubet further explained that when an attorney agrees to represent a client, the attorney undertakes a fiduciary duty to put his skills to the advantage of the client. A fiduciary duty is an obligation of the utmost trust and confidence. Moreover, because an attorney-client relationship depends on either an oral or written contract, the attorney must fulfill the duties he agreed to pursuant to the contract. Finally, the duty of care requires an attorney to possess and apply the skills and knowledge of a reasonably well qualified attorney.

Lubet testified that in his opinion, accepting the accuracy of Mary's deposition testimony, Lowery failed to fulfill a number of his professional obligations. Specifically, he failed to advise Mary of the existence of a $1 million settlement offer before he rejected it, failed to tell her that the negotiations could be or had been reopened after he rejected the offer, failed to provide her with a written contingency fee agreement, attempted to collect expenses in the absence of a signed contingency agreement, did not keep her informed about the status of the case as it was proceeding to trial, and did not "give her the information necessary to allow her to make a decision about settling the case at the crucial moment."

Regarding the contingency fee agreement, Lubet testified over defense counsel's objection that an attorney is not entitled to a contingent fee in the absence of a written contingent fee

agreement. In the absence of such an agreement, Lubet also did not believe that an attorney could make a claim for costs and expenses, although a smaller amount might be allowed based on the benefit conferred upon the client by the attorney. The trial court orally cautioned the jury that it was allowing Lubet to testify in this regard for "the limited purpose of indicating that a million dollar offer may or may not mean a million dollars." The court explained that legal fees, costs, and liens might be taken from the settlement amount, and that had to be conveyed to the client in order for her to make an informed decision as to whether to accept or reject the settlement offer.

Regarding Lowery's alleged failure to communicate the settlement offer, Lubet testified that once a settlement offer has been made, the attorney has an "absolute duty" to convey that offer to the client unless the client has rejected it in advance. Lubet also testified that because the attorney client relationship depends on allowing the client to make a decision as to settlement, "rejecting an offer before even telling the client is the starkest of violations" of the rules of professional conduct. If the attorney does not think the offer is adequate, he can explain that to the client but must allow her to make the ultimate decision. According to Lubet, the failure to communicate a settlement offer also violates the duty of care as well as an attorney's fiduciary and contractual duties to a client.

Regarding the attorney's duty to provide the client with sufficient information to make an informed decision, Lubet testified that Lowery did not give Mary sufficient information if he failed to tell her about the settlement offer before rejecting it. If Lowery did tell Mary about the offer, he also should have apprised her as to the progress of the case including whether motions had been decided favorably or unfavorably.

Lubet testified that Lowrey had a number of specific obligations to Mary that arose out of his duty to provide her with sufficient information to make an informed decision regarding settlement of the medical malpractice case. Specifically, Lubet had an obligation to tell Mary that she had to repay his costs and expenses regardless of the outcome of the case, to explain to her the effect that settlement would have on her need to repay any outstanding medical bills, and to tell her that he believed the defendants had more than $1 million to settle the case. Lowery also had an obligation to tell Mary that settlement talks could continue despite rejection of the $1 million offer, to keep her apprised of rulings on important motions, and to tell her that there was an attempt to reopen settlement discussions while the jury was deliberating. Finally, Lowery had an obligation to obtain Mary's permission to make the "high-low" offer. Lubet explained that when the defendants in the medical malpractice case attempted to reopen settlement discussions and asked Lowery to lower his demand of $8.5 million, Lowery explicitly refused to do so by responding with the high-low offer. Lowery needed to explain to Mary that the cost of that decision was losing the opportunity to get an offer from defendants that was more than $1 million. The failure to convey this information breached the duty of care as well as Lowrey's fiduciary and contractual duties.

Finally, Lubet testified that, based on the undisputed facts and accepting Lowery's deposition testimony, it was his opinion that Lowery did not make adequate disclosures and sufficiently explain and counsel Mary before the rejecting the settlement. That failure was also a violation of the duty of care as well as Lowrey's fiduciary and contractual duties.

On cross-examination, Lubet testified that he had never handled a catastrophic personal

injury case and that he did not have expertise counseling clients on when to settle those type of cases. Lubet acknowledged that he was not qualified to testify as to the risks associated with trying a medical malpractice case or as to whether an attorney complied with the standard of care in recommending that the amount of a settlement was either adequate or inadequate.

Mary, Jordan King's mother, testified that Lowrey did not tell her of the $1 million settlement offer until after he had rejected it. Lowrey advised Mary of the settlement offer during a phone conversation, specifically telling her, "[o]h, by the way, they made some ridiculous offer, and I told 'em it was ridiculous and unacceptable and that's -- we're not gonna take that kind of offer." When Mary asked Lowrey if they could go back and tell the defendants that they had changed their mind, Lowrey told her that they could not and that "once [the offer is] off the table, it's off the table." Lowrey never sent Mary a letter following up on that conversation, and Mary assumed that Lowrey had rejected the offer and that there was nothing more she could do. Lowrey had not previously sent Mary any letters discussing the pros and cons of settling the case or how much the settlement demand ought to be, and Mary did not give Lowrey authority to settle the case without her informed consent or tell him to "just use his judgment" in settling the case. Mary testified that she would have accepted the $1 million offer had Lowrey communicated it to her before rejecting it.

Mary further testified that Lowrey did not tell her that the $1 million offer was on the table and available throughout the entire trial or that, while the jury was deliberating, the defendants had tried to reopen settlement discussions. Mary stated that at no time did she tell Lowrey that she refused to settle the case and that she wanted the millions that she was entitled to. Mary

explained that her motivation was "not the money" but, rather, to "go after the doctor so he couldn't do it to another baby."

Mary also testified that Lowrey did not tell her that the settlement offer included the waiver of any outstanding bill from Loyola University Medical Center, that other doctors had looked at the case and determined that there was no malpractice, and that Lowrey believed the defendants had more than $1 million to settle the case. According to Mary, she was "not a big risk taker," and she would have "absolutely" instructed Lowrey to settle the case had he relayed this information to her.

Mary also testified that she did not sign a written contingent fee contract with Lowrey, but indicated that when she hired him after Jordan was born, she was told that it was on a contingent fee basis. Because Mary was "afraid" of the costs she would incur by going to trial, Lowrey told her that he would take a 25% fee only if she won and that Mary would owe him nothing if she lost or if the case did not settle. Lowrey did not tell her that she had to repay his costs and expenses regardless of the outcome of the case. Mary was therefore "shocked" to see the agreement that Lowrey sent her in May 1997, which stated that "[c]osts and expenses are the sole obligation of the client, regardless of the outcome." It appeared to Mary that Lowrey was trying to make her pay for expenses that he had previously told her she would not have to pay if the case was lost. Mary did not sign the agreement.

Mary next stated that Lowrey did not allow her to be in the courtroom during trial because he said that she was "too emotional" and that her presence "would be a problem for the case." Mary explained to Lowrey on several occasions that she was uncomfortable not being in

the courtroom and that she was concerned that the jury would think that she did not care because she was not present. When she explained this to Lowrey, he told her that she was "absolutely not allowed in the courtroom" and threatened to not let her in if she tried to come to court.

Mary also said that in addition to preventing her from being present during trial, Lowrey did not tell her that important evidence had been kept from the jury. Therefore, Mary did not know until after Reiter's testimony that the trial court in the underlying case had excluded the evidence regarding the football game or that the court had denied Lowrey's request that the jury be given a missing evidence instruction regarding the lost placenta. Mary stated that she would have been more likely to settle the case had Lowrey told her this information.

On cross-examination, Mary acknowledged that the million dollar offer did matter to her because she was a responsible mother who wanted to take care of her child and it was going to cost a lot of money to do so. However, her underlying concern was to ensure that the hospital and the doctor were not able to harm another baby. Mary testified that she did not believe that going after a guilty verdict at trial would achieve her goal of "going after" the doctor. Mary assumed that Lowrey's fees would come out of the 25% he would receive if they won or settled the case.

Mary also testified on cross-examination to the content of a number of letters she received from Lowrey. Specifically, Lowrey sent Mary a letter in May 1991, stating that labor and delivery cases were the most difficult to prove because determining what caused the injury is an essential and difficult element to prove at trial. Lowrey also sent a letter to Mary and her father in July 1995, stating that a respected doctor had given a deposition which provided Loyola with a strong

defense and that a strong defense meant "that Loyola may never offer money or will offer less than if the liability was unquestionably favored."

On cross-examination, Mary estimated that, from 1993 to 2003, it had cost in excess of $100,000 a year for Jordan's health care. Mary told Lowrey that she wanted to win the case and that, in terms of damages, she wanted an amount that would enable her to take care of Jordan. Mary also testified that she would not have followed Lowrey's advise had he counseled her that the million dollar offer was inadequate and that she should proceed to trial. Plaintiff rested following Mary's testimony.

Defendants' first witness was Lowrey, who testified that he presented the medical malpractice case to two mock juries prior to trial. One of the juries returned a verdict of $8.2 to $8.5 million, while the other returned a verdict as high as $20 million. Lowrey also testified that a million dollar settlement was inadequate to cover the costs of Jordan's future needs. On cross-examination, Lowrey acknowledge that one of the mock juries actually found in favor of the hospital and the doctor, and that the mock jury returned a verdict of $20 million only after the group moderator stepped in and asked them how much they would award if they were forced to award damages.

Defendants then presented the expert testimony of Terry Lavin, a civil trial attorney. Lavin testified that in his opinion, particularly as it related to settlement and communications with his client, Lowrey "did exactly what you would expect of a reasonably well qualified trial lawyer under these circumstances."

Lavin also testified that the $1 million settlement was "inadequate to cover any single item

of loss suffered by [the] child." Specifically, the settlement was inadequate to cover Jordan's disability, disfigurement, pain and suffering, or lost earnings, and it was "only a fraction" of the medical expenses that Jordan would incur over his lifetime. In light of the strength of the underlying medical malpractice case, Lavin believed that it was appropriate that Lowrey recommend that the offer be rejected and that the client also reject the offer. Lavin also testified that in his opinion, assuming Mary would have accepted the $1 million settlement against Lowrey's advice, Lowrey should have asked the court to appoint a guardian *ad litem* to review the case and recommend to the court whether or not the case ought to be settled. On cross-examination, Lavin acknowledged that the underlying medical malpractice case was "definitely" losable.

Following Lavin's testimony, the defense rested and moved for a directed verdict, which the trial court denied. The jury returned a verdict in favor of plaintiff in the amount of $1 million. The trial court subsequently denied defendants' request for judgment *n.o.v.* and a new trial, and also denied plaintiff's posttrial motions for prejudgment interest and attorney fees. This appeal followed.

Defendants initially contend that the trial court erred by denying their motion for a directed verdict. Specifically, defendants argue that plaintiff failed to establish the applicable standard of care and that defendants deviated from that standard. Defendants also argue that plaintiff failed to establish that but for defendants' alleged negligence, plaintiff would have received the $1 million settlement.

Verdicts ought to be directed only when all the evidence, when viewed most favorably to

the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Los Amigos Supermarket, Inc. v. Metropolitan Bank & Trust Co.*, 306 Ill. App. 3d 115, 130 (1999). We review the denial of a motion for directed verdict *de novo. Los Amigos Supermarket*, 306 Ill. App. 3d at 130.

To prevail in an action for legal malpractice, plaintiff must prove the following elements: (1) the existence of an attorney-client relationship that establishes a duty on the part of the attorney; (2) a negligent act or omission constituting a breach of that duty; (3) proximate cause establishing that but for the attorney's negligence, the plaintiff would have prevailed in the underlying action; and (4) damages. *Cedeno v. Gumbiner*, 347 Ill. App. 3d 169, 174 (2004). "An attorney must exercise a reasonable degree of care and skill in the representation of his clients." *Los Amigos Supermarket*, 306 Ill. App. 3d at 130. The plaintiff must generally present expert testimony to establish the standard of care against which the attorney's conduct must be measured. *Los Amigos Supermarket*, 306 Ill. App. 3d at 130-31. Failure to present such testimony is generally fatal to a legal malpractice action unless the attorney's negligence is so apparent that a lay person would have no difficulty seeing it. *Los Amigos Supermarket*, 306 Ill. App. 3d at 131.

Defendants first claim that the trial court erred in denying their motion for a directed verdict because plaintiff failed to present expert testimony establishing the standard of care that Lowrey was required to meet when representing plaintiff in the underlying medical malpractice case. Specifically, defendants allege that plaintiff failed to present evidence showing how a reasonably well-qualified attorney would have handled the settlement offer in the medical

malpractice case. We disagree.

In the present case, the evidence before the trial court and jury was that the parties had entered into an agreement whereby defendants would provide legal services to Jordan King. Although the parties disagree as to the form of that agreement (defendants contend written, plaintiff contends oral), neither side disputes the existence of an attorney client relationship between defendants and the Kings.

Plaintiff presented expert testimony through Professor Lubet to establish the standard of care that Lowrey was required to meet with regard to the settlement offer. Professor Lubet explained that attorneys in Illinois are governed by the Rules of Professional Conduct, and that attorneys also owe their clients the duty of care as well as fiduciary and contractual duties. Professor Lubet testified that the client is ultimately responsible for accepting or rejecting any settlement offer and that an attorney has an "absolute duty" to convey any settlement offer to the client unless it has been rejected in advance. This duty is reflected in Rule 1.2 (134 Ill. 2d R. 1.2), which specifically requires an attorney to abide by a client's decision whether or not to settle a case.

Professor Lubet further testified that in his opinion, assuming the accuracy of Mary's deposition testimony, Lowrey violated his professional obligations by failing to advise Mary of the $1 million settlement offer before he rejected it. Lubet stated that because the attorney-client relationship depends on allowing the client to make the ultimate decision as to settlement, "rejecting an offer before even telling the client is the starkest of violations" of the rules of professional conduct. Additionally, Lubet testified that Lowrey's failure to communicate the

settlement offer before rejecting it also violated the duty of care as well as an attorney's fiduciary duties to a client.

Professor Lubet also testified that an attorney has a duty to provide the client with sufficient information to make an informed decision regarding settlement of a case. Specifically, Rule 1.4 (134 Ill. 2d R. 1.4) requires an attorney to keep a client reasonably informed of the status of a matter and to provide the client with the information necessary to make an informed decision regarding the representation. Lubet testified that Lowrey had a number of obligations to Mary that arose out of this duty. Specifically, Lowrey had an obligation to tell Mary that she had to repay his costs and expenses regardless of the outcome of the case, to explain to her the effect that settlement would have on any outstanding medical bills, and to tell her that he believed the defendants had more than $1 million to settle the case. Lowrey also had an obligation to tell Mary that settlement discussions could continue despite the rejection of the $1 million offer, to keep her apprised of rulings on important motions, and to tell her that there was an attempt to reopen settlement discussions while the jury was deliberating. Finally, Lubet testified that Lowrey had an obligation to obtain Mary's permission to make the "high-low" offer and to explain to her that the cost of making that offer was giving up the opportunity to get an increased settlement offer from the defendants.

Lubet finally testified that Lowrey failed in his duty to provide Mary with sufficient information to make an informed decision regarding settlement of the medical malpractice case. Lubet stated that, accepting Mary's deposition testimony that Lowrey did not tell her of the settlement offer before rejecting it, it was his opinion that Lowrey failed to provide Mary with

sufficient information to make an informed decision regarding settlement of the case. Lubet further testified that, based on the undisputed facts and accepting Lowrey's testimony as true, it was his opinion that Lowrey still did not make adequate disclosures and sufficiently explain and counsel Mary before rejecting the settlement offer. Lubet also testified that Lowrey failed in a number of his other professional obligations toward Mary. Specifically, Lowrey failed to tell Mary that settlement discussion could be or had been reopened after the $1 million offer was rejected, failed to provide her with a written contingency fee agreement, failed to keep her informed as to the status of the case, including rulings on important motions, and attempted to collect expenses in the absence of a written contingency fee agreement.

We find that Professor Lubet's expert testimony sufficiently established the standard of care which Lowrey was required to meet with regard to communicating the settlement offer to her and providing her with sufficient information to make an informed decision regarding settlement of the case. Lubet's testimony also established that Lowrey breached those duties if he did not advise Mary of the settlement offer before he rejected it and that, even if Lowrey did tell her of the settlement offer, he nevertheless failed to provide Mary with sufficient information to make an informed decision. Accordingly, we find that the trial court did not err in denying defendants' motion for a directed verdict.

Defendants nevertheless argue that Lubet had no experience evaluating medical malpractice cases and therefore claim that he could not have established the standard of care that an attorney handling a complex medical malpractice case was required to meet.

Defendants' argument is misplaced. Most importantly, defendants appear to confuse the

issues that were before the jury in this case. There was no issue raised as to whether Lowrey properly handled or evaluated the merits of the medical malpractice case. Rather, the issues before the jury were whether Lowrey communicated the $1 million settlement offer to Mary and whether he provided her with sufficient information to make an informed decision regarding settlement of the medical malpractice case. As noted, Lubet's testimony sufficiently established the specific duties that Lowrey owed to Mary in this regard and that Lowrey's conduct constituted a breach of those duties.

Moreover, Lubet's experience handling medical malpractice cases was irrelevant to his testimony and the professional duties which that testimony established. Although Lubet was not an expert in medical malpractice cases, he was an expert advising medical malpractice attorneys of their ethical obligations. As Lubet explained, an attorney's professional responsibilities or ethics is a field that transcends any particular area of practice, and the duties arising out of those professional responsibilities are ones that every attorney owes to his client. It was those duties that Lowrey was found by the jury to have breached, and we therefore find that the trial court properly denied defendants' motion for a directed verdict.

In reaching this conclusion, we find *Barth v. Reagan*, 190 Ill. App. 3d 516 (1989), relied upon by defendants, distinguishable from the instant case. In *Barth*, defendant argued that the circuit court erred in submitting the issue of attorney malpractice to the jury without the expert testimony of an attorney. *Barth*, 190 Ill. App. 3d at 520-21. Plaintiff acknowledged that she did not present expert testimony to establish the standard of care, but claimed that such testimony was not needed because defendant's failure to communicate with her was so clearly and obviously

a breach of duty that a lay person could appraise it without expert testimony. *Barth*, 190 Ill. App. 3d at 521. The appellate court observed that Illinois follows the general rule "that expert evidence is required in a legal malpractice case to establish the attorney's breach of his duty of care except in cases where the breach or lack thereof is so obvious that it may be determined by the court as a matter of law, or is within the ordinary knowledge and experience of laymen." *Barth*, 190 Ill. App. 3d at 522. The court held, however, that under the facts presented, it could not say that the attorney's failure to personally communicate with plaintiff constituted negligence so grossly apparent that a layman would have no difficulty recognizing it. *Barth*, 190 Ill. App. 3d at 523.

Here, unlike in *Barth*, plaintiff did not claim that defendants' conduct was so clearly and obviously a breach of duty that a laymen could appraise it without expert testimony. Rather, as previously discussed, plaintiff presented the expert testimony of Professor Lubet to establish the standard of care that defendants were required to meet and the breach of that standard. Accordingly, *Barth* provides no basis for reversing the trial court's denial of defendants' motion for a directed verdict.

Defendants also claim that the trial court erred in denying their motion for a directed verdict because plaintiff failed to establish that she would have received the $1 million settlement but-for defendants' negligence. Specifically, defendants assert that because a trial court must approve or reject any settlement agreement proposed on a minor's behalf (see 755 ILCS 5/19-8 (West 2004)), plaintiff's legal malpractice action was dependent on proving that the trial court in the medical malpractice case would have approved the $1 million settlement had Mary accepted

it. Defendants maintain that plaintiff failed to sustain this burden and that the settlement offer was unreasonable and would not have been approved by the court. Defendants also claim that the trial court erred by ruling that it was for the jury to decide whether the settlement would have been approved, and assert that this determination could only be made by a judge after conducting an evidentiary hearing.

In their motion for a directed verdict, defendants argued that plaintiff failed to establish that her injuries were proximately caused by defendants' negligence. Specifically, defendants asserted that plaintiff presented no evidence that a court would have approved a $1 million settlement as being in the best interests of the minor. In denying defendants' motion, the court stated that there were sufficient facts to go to the jury on proximate cause and that whether the trial judge in the underlying medical malpractice case would have approved the settlement was a factual question to be decided by the jury. The trial court also added: "And I have to give my imprimatur. I find that a million dollars is fair and reasonable. It never got to [the trial judge] because the million dollars was never accepted because, according to plaintiff, it was never offered while it was still on the table."

The question raised by defendants' contention is whether plaintiff's legal malpractice case was dependent upon proving that the trial court in the underlying medical malpractice action would have approved the $1 million settlement as being in the best interests of the minor. This is an issue of first impression, as our research has not revealed any authority considering this question. However, for the following reasons, we agree with defendants that plaintiff's legal malpractice action was dependent upon proving that the trial court would have approved the

1-05-3686

settlement.

"The theory underlying a cause of action for legal malpractice is that the plaintiff client would have been compensated for an injury caused by a third party, absent negligence on the part of [plaintiff's] attorney." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 226 (2006). To prove proximate causation in a legal malpractice case, plaintiff must essentially prove a "case within a case," that is, plaintiff must prove the underlying action and what her recovery would have been in that action absent the alleged malpractice. *Merritt v. Goldenberg*, 362 Ill. App. 3d 902, 910 (2005). In other words, plaintiff must establish that "but for" the attorney's negligence, she would not have suffered the damages alleged. *Merritt*, 362 Ill. App. 3d at 910. Damages are not presumed in a legal malpractice case, and plaintiff bears the burden of proving that she suffered damages as a result of the attorney's negligence. *Sheppard v. Krol*, 218 Ill. App. 3d 254, 259 (1991).

Here, because the underlying medical malpractice action involved a minor, the trial court would have had to approve any settlement agreed to by the parties as being in the best interest of the minor. See 755 ILCS 5/19-8 (West 2004) ("By leave of court *** a representative may compound or compromise any claim or any interest of the ward *** in any personal estate *** upon such terms as the court directs"). Therefore, even if Mary had been told of and thereafter accepted the $1 million settlement offer, the trial court would still have had to approve that settlement as being in the best interest of the minor. Accordingly, in order for plaintiff to prove that she suffered damages as a result of Lowrey's failure to communicate the settlement offer and that she would have been compensated for those damages, plaintiff was required to prove that the

-26-

settlement would have been approved by the trial court.

Having so concluded, we must now consider whether it was the responsibility of the trial court or the jury in this case to determine whether the trial judge in the medical malpractice action would have approved the settlement. Defendants contend that the trial court erred by ruling that it was for the jury to decide whether the trial judge in the underlying action would have approved the settlement. Defendants maintain that it was not for the jury to make this determination because a jury has no power to determine what a court should or would do. Rather, according to defendants, this determination could only be made by a judge after conducting the same evidentiary hearing that would have occurred in the underlying case.

Initially, we find that defendants have waived this contention by failing to raise it in their motion for a directed verdict or in their motion for posttrial relief. See *Morgan v. Richardson*, 343 Ill. App. 3d 733, 742 (2003) (failure to object at trial and to raise the issue in a posttrial motion results in waiver of that issue on appeal). In their motion for a directed verdict, defendants argued that plaintiff failed to present evidence that a court would have approved the $1 million settlement. Implicit in defendants' argument was the assertion that plaintiff failed to present any such evidence to the *jury*. In denying defendants' motion, the trial court ruled that whether or not the judge in the underlying action would have approved the settlement was a factual question for the jury. Defendants assigned no error to this ruling in their posttrial motion but rather reasserted that plaintiff presented no evidence that the settlement would have been approved.

A primary purpose of the waiver rule is to ensure that the trial court has the opportunity to

correct any errors before they are raised on appeal. *Moller v. Lipov*, 368 Ill. App. 3d 333, 342 (2006). This purpose is especially relevant here where the trial judge was never asked to determine if it was his or the jury's responsibility to decide whether the settlement would have been approved by the court in the underlying action. Because defendants did not ask the court to make this determination, they have waived their contention on appeal that whether the trial court would have approved the settlement is an issue of law to be decided by a judge. See *Camco, Inc. v. Lowrey*, 362 Ill. App. 3d 421, 433 (2005) (An issue raised for the first time on appeal is waived).

The doctrine of waiver, however, is a limitation on the parties and not on this court. *Camco*, 362 Ill. App. 3d at 433. Despite waiver, this court may address an issue in order to carry out its responsibility to reach a just result. *El Sauz, Inc. v. Daley*, 328 Ill. App. 3d 508, 518 n.2 (2002); *Mellon v. Coffelt*, 313 Ill. App. 3d 619, 626 (2000). Because this issue may rise again, and considering the strong public policy in this state of protecting the interests of a minor (see *Villalobos v. Cicero School District 99*, 362 Ill. App. 3d 704, 712 (2005) ("it is the public policy of this state that the rights of minors be guarded carefully")), we choose to address the merits of defendants' contention.

As we are aware of no authority considering the issue before us, we begin our analysis by observing that proximate causation in a legal malpractice case is generally a factual issue to be decided by the trier of fact. *Renshaw v. Black*, 299 Ill. App. 3d 412, 417-18 (1998). Our supreme court has explained that the basis for this principle is that "issues that could cause reasonable persons to reach different results should never be determined as questions of law. The

debatable qualities of issues such as proximate cause, the fact that fair-minded persons might reach different conclusions, emphasize the appropriateness of leaving such issues to a fact-finding body." *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 210 (2006).

However, in *Governmental Interinsurance Exchange*, the court held that "the issue of proximate cause in an *appellate legal malpractice* action is inherently a question of law for the court and not a question of fact for the jury." (Emphasis added.) *Governmental Interinsurance Exchange*, 221 Ill. 2d at 21. The basis for the court's ruling was that determining whether an appeal would have been successful requires analysis of the law and procedural rules, and that such analysis is uniquely a judicial function that is properly placed in the hands of the trial judge and not the jury. See *Governmental Interinsurance Exchange*, 221 Ill. 2d at 210-14.

The issue before us does not fall under either the general rule that proximate cause in a legal malpractice action is a factual question for the jury or the rule that proximate cause in an appellate malpractice action is a question of law for the trial court. The present case does not arise in the context of appellate malpractice, and therefore, contrary to defendants' assertion, *Governmental Interinsurance Exchange* is not dispositive. However, the trial court's approval of the settlement was not an element of plaintiff's underlying medical malpractice action that would have been decided by the fact finder in that case, and it is therefore not a normal question of fact to be decided by the jury in the legal malpractice case. See Restatement (Third) of Law Governing Lawyers §53, Comment *b*, at 390 (2000) ("What would have been the result of a previous trial presenting issues of fact normally is an issue for the fact-finder in the negligence or fiduciary-breach action"). Instead, court approval of the settlement is a requirement imposed by

statute in order to protect the minor's interests. *Villalobos*, 362 Ill. App. 3d at 712.

After careful consideration, we conclude that the issue of whether the trial court would have approved the settlement is a question of law to be decided by the trial court in the legal malpractice case. A review of the law applicable to a minor involved in litigation convinces us that this issue must be decided by the trial court. In Illinois, a minor involved in litigation is a ward of the court, and it is the court that is vested with the duty and discretion to protect the minor's interests. *Wreglesworth v. Arctco, Inc.*, 316 Ill. App. 3d 1023, 1026 (2000). Moreover, consistent with that duty, it is the trial court that is statutorily required to approve or reject any settlement agreed to on the minor's behalf. See 755 ILCS 5/19-8 (West 2004). We do not believe that the jury should assume a role in a legal malpractice case that the legislature has specifically committed to the discretion of the trial court. To do so would be contrary to the legislature's intent and would give the jury a power in the context of a legal malpractice case that it would not otherwise possess. Accordingly, we find that it was the responsibility of the trial judge in the legal malpractice case to determine whether the settlement would have been approved by the court in the underlying medical malpractice action.

We recognize that the trial court in this case never made this determination because the court ruled that whether the settlement would have been approved was a question of fact for the jury. Given our determination that this question is actually a legal one to be decided by a judge, the trial court's reasoning was erroneous.[1] However, our role is to review the propriety of the

---

[1]We understand the basis for the trial court's ruling. This was an issue of first impression, and the court's ruling was consistent with the general principle that proximate causation in a legal malpractice case is a factual issue to be decided by the jury. See *Governmental Interinsurance*

trial court's denial of defendants' motion for a directed verdict, not its reasons for doing so. See *City of Chicago v. Holland*, 206 Ill. 2d 480, 491-92 (2003) (reviewing court's role is to review the trial court's judgment and not its reasoning). As a reviewing court, we may affirm the trial court's denial of defendants' motion for a directed verdict on any basis appearing in the record, regardless of whether the trial court relied on that basis and regardless of whether the trial court's reasoning was correct. See *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 460 (2006). For the reasons that follow, we affirm the trial court's denial of defendants' motion for a directed verdict because we find that the record contains sufficient facts for us to conclude as a matter of law that the trial judge in the underlying medical malpractice action would have approved the settlement.

Defendants assert that the settlement offer would not have been approved by the court. Defendants maintain that the offer was unreasonable and inadequate given the severity of Jordan's injuries, the cost of his future health care, and the strengths of the underlying medical malpractice case.

As previously noted, in Illinois, a minor involved in litigation is a ward of the court, and the court has the duty and broad discretion to protect the minor's interests. *Wreglesworth*, 316 Ill. App. 3d at 1026. This duty is reflected in the statutory requirement that the court approve or reject any settlement proposed on the minor's behalf. *Villalobos*, 362 Ill. App. 3d at 712; 755 ILCS 5/19-8 (West 2004). The trial court has the authority to approve such a settlement when the evidence shows that the compromise is in the best interests of the minor. *Ott v. Little Co. of*

*Exchange*, 221 Ill. 2d at 213.

-31-

*Mary Hospital*, 273 Ill. App. 3d 563, 570, 573 (1995).  In making this determination, "the court is permitted to review the parties' positions, analyze their potential strengths and weaknesses, and estimate probabilities of liability and damage award."  *Ott*, 273 Ill. App. 3d at 573; see also *Hudson v. Thies*, 27 Ill. 2d 548, 550 (1963) (court must consider question of liability as well as extent of minor's injuries); *Wolf v. Uhlemann*, 325 Ill. 165 (1927), and *Lyons v. Whittington*, 109 Ill. App. 3d 197 (1982) (both cases finding that doubt or uncertainty as to minor's recovery is considered when making best interests of minor determination).  The court may also consider any statistics regarding the probabilities of jury verdicts in favor of plaintiffs and the average dollar amount of those verdicts.  See *Ott*, 273 Ill. App. 3d at 574.  Finally, the court may consider the wishes of the minor's parents and the recommendations of any guardian *ad litem*.  See *Ott*, 273 Ill. App. 3d at 574 (upholding settlement where trial judge considered, in part, the wishes of the minor's parents, who were court-appointed guardians of her estate, and the recommendations of the guardian *ad litem*).

In this case, we believe the record clearly establishes that the trial court in the underlying action would have approved the settlement.  Although defendants claim that the settlement was inadequate in light of the costs of Jordan's future health care, the adequacy of the settlement must also be considered in light of the risk that liability was contested and that the jury could find in favor of the medical malpractice defendants.  See *Hudson*, 27 Ill. 2d at 550 ("If the amount of the settlement is considered solely in terms of the injuries suffered by the plaintiff, without regard to the liability of the defendant, it is easy to conclude that the amount was inadequate.  But there is no reason to disregard the fact that the claim was controverted and that liability was doubtful").

-32-

Here, considering the parties' strengths and weaknesses, the record shows there was a risk that the jury in the underlying case would find that the medical malpractice defendants were not liable for Jordan's injuries. Defendants' expert Lavin testified that the medical malpractice case was "definitely" losable. Lowrey testified that he tried the case before two mock juries, one of which found in favor of the medical malpractice defendants. Lowrey also acknowledged that some of the doctors he interviewed about the case gave negative reviews and said there was no malpractice. Lowrey sent Mary a letter in May 1991, stating that labor and delivery cases "are the most difficult malpractice cases to prove" because of the difficulty in proving causation. Lowrey also sent Mary and her father a letter in July 1995, stating that a respected doctor had given a deposition which gave Loyola a strong defense, and that a strong defense meant Loyola might not offer to settle or might offer to settle for less than if liability unquestionably favored Mary and Jordan.

The record further shows that the trial court in the medical malpractice case made two important evidentiary rulings that were damaging to the plaintiffs' case. Specifically, the trial court refused to give the jury a missing evidence instruction regarding Mary's lost placenta and granted defendants' motion to bar any reference to the entries in Mary's chart regarding the football game. Although the trial court had not ruled on these issues when the $1 million settlement was made, that offer remained available to Mary even after the trial court made these rulings, which Reiter characterized as "better than good" for the defense. Reiter also testified that he assumed the $1 million offer included a waiver of any outstanding hospital bill from Loyola, and Lowrey testified that the outstanding hospital bill from Loyola was $147,000.

1-05-3686

Additionally, the jury in this case found that a reasonable person would have accepted the settlement, and Mary's testimony established she would have accepted the settlement given her goals in filing the lawsuit and the risks of going to trial. Mary specifically testified that her motivation was "[n]ot the money," but rather to "go after the doctor so he couldn't do it to another baby," and that going after a guilty verdict at trial would not have achieved this goal.

Considering all of this evidence, we find that the trial court in the underlying action would have approved the settlement as being in the best interests of the minor. Therefore, we affirm the trial court's denial of defendants' motion for a directed verdict.

Our conclusion is supported by the trial court's ruling on defendants' motion for a directed verdict. In that motion, defendants argued that plaintiff failed to present evidence that the judge in the underlying action would have approved the settlement. The trial court denied defendants' motion and held that this was a question of fact to be decided by the jury and that there were sufficient facts to go to the jury on proximate cause. A directed verdict is appropriate only when all of the evidence, viewed most favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Los Amigos Supermarket, Inc.*, 306 Ill. App. 3d at 130. Therefore, by denying defendants' motion, the trial court essentially ruled that evidence had been presented upon which the jury could conclude that the judge in the underlying action would have approved the settlement. That the trial court erroneously believed that court approval was an issue for the jury is irrelevant; the court's ruling nevertheless reflects its belief that sufficient evidence of court approval had been presented.

Our conclusion is also supported by the trial court's comments in this case regarding the

-34-

1-05-3686

settlement offer. In denying defendants' motion for a directed verdict, the court stated that it would have been up to the trial judge in the medical malpractice action to approve the $1 million settlement. The court then added "I have to give my imprimatur. I find that a million dollars is fair and reasonable." Additionally, in denying defendants' motion for judgment notwithstanding the verdict, the court observed that the jury found that a reasonable person under similar circumstances would have accepted the settlement, and then added:

> "Now that reasonable person under similar circumstances is Mrs. King, as special administrator for the estate of her son. And the Jury has found *** that Mrs. King, acting as a reasonable person would have and should have accepted the offer that was made, if it had been communicated to her.
>
> If a reasonable person acting under similar circumstances would have and should have, according to the jury that we had in this case, accepted the offer of a million dollars, and I realize it's a different standard, but it can be inferred that Judge Maddux being a reasonable person also in the interest of the minor and those are the circumstances that are presented in the underlying case, would have also approved."

We believe that these comments reflect that had the trial court in this case ruled on this issue as a matter of law, it would have found that the trial judge in the underlying action would have approved the settlement.

-35-

1-05-3686

Defendants next contend that the trial court erred by denying their motion for judgment *n.o.v.* Specifically, defendants claim that plaintiff failed to present evidence that the court would have approved the settlement given the merits of the case and the high costs of Jordan's long-term care. However, in light of our holding that the record contains sufficient facts for us to conclude as a matter of law that the settlement would have been approved, we find that defendants' contention is without merit.

We do address one point raised by defendants in support of their argument that the trial court erred in denying their motion for judgment *n.o.v.* Defendants claim that Lavin testified that the trial court would not have approved the $1 million settlement given the strength of the medical malpractice case and the costs of Jordan's future healthcare. Defendants mischaracterize Lavin's testimony. Lavin testified that the $1 million settlement offer was inadequate and should have been rejected by Mary and her attorney. Lavin was never asked whether the trial court would have approved the settlement and, contrary to defendants' contention, he offered no testimony on this issue.

Defendants also claim that the trial court erred by denying their motion for judgment *n.o.v.* because plaintiff failed to provide any evidence of the standard of care for representing a plaintiff in a complex medical malpractice case, failed to provide evidence of a breach of the standard of care, and failed to prove actual damages. This contention, however, is raised in a single sentence and is without supporting argument. Mere contentions, without argument or citation of authority, do not merit consideration on appeal and are waived. *Elder v. Bryant*, 324 Ill. App. 3d 526, 533 (2001). According, we find that defendants' contention is waived.

1-05-3686

Defendants next contend that the trial court erred in denying their motion for a new trial. Defendants specifically assert that the trial court improperly allowed evidence of the missing written contingent fee agreement and erroneously gave the jury a missing evidence instruction relating to that agreement. Defendants further assert that the trial court erred by allowing speculative testimony regarding the possibility of a settlement in excess of $1 million and by making comments that improperly bolstered the credibility of plaintiff's expert witness. Defendants finally assert that the trial court erred in denying their motion for a new trial because the verdict was against the manifest weight of the evidence.

The decision of whether to grant a motion for a new trial is committed to the sound discretion of the trial court. *State Farm Mutual Insurance Co. v. Ellison*, 354 Ill. App. 3d 387, 389 (2004). A court's ruling on a motion for a new trial will not be reversed except where it is shown that the court abused its discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992).

Defendants first claim that they are entitled to a new trial because the trial court improperly allowed plaintiff's counsel to argue and question Professor Lubet on the possible contents of the missing contingency fee agreement, and improperly allowed plaintiff to introduce Illinois Rule of Professional Conduct 1.5(c) (134 Ill. 2d R. 1.5(c)), which requires a contingent fee agreement to be in writing. Defendants assert that the agreement was not relevant to any disputed issue in the case and served no purpose other than to portray Lowrey as an unethical attorney.

We find that defendants have waived this claim by failing to comply with Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). Supreme Court Rule 341(h)(7) requires appellants'

brief to include " '[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on.' " *Salgado v. Marquez*, 356 Ill. App. 3d 1072, 1074 (2005), quoting 210 Ill. 2d R. 341(h)(7). " '[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1994), quoting *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is, therefore, waived. *Vincent v. Doebert*, 183 Ill. App. 3d 1081, 1087 (1989).

Here, on appeal, defendants do not provide any case law that would support a claim that questions and testimony regarding the fee agreement were improper. Rather, defendants merely assert that plaintiff's counsel's statements were designed to portray Lowrey as unethical and dishonest and were intended to divert the jury's attention away from the lack of evidence of the standard of care. Contentions unsupported by citation of authority fail to meet the requirements of Supreme Court Rule 341(h)(7) and are therefore waived. *Elder*, 324 Ill. App. 3d at 533.

We also find that defendants have waived their objection to the introduction of Rule 1.5(c). Defendants did not object when plaintiff moved to admit Rule 1.5(c) into evidence during Lowrey's testimony. Defendants' failure to object at trial results in waiver of this issue on appeal. *Simmons v. Garces*, 198 Ill. 2d 541, 567 (2002).

Moreover, evidentiary rulings are within the sound discretion of the trial court and will not

be overturned absent a clearly evident abuse of that discretion. *Simmons*, 198 Ill. 2d at 567. Here, one of the primary issues before the jury was whether defendant provided Mary with sufficient information to make an informed decision regarding settlement of the medical malpractice case. As the trial court noted, the amount of Lowrey's fee and whether repayment of his costs and expenses depended on the outcome of the case were relevant to Mary in determining how much of a million dollar settlement she would actually retain. As the trial court also noted, this information was relevant and needed to be communicated to Mary in order for her to make an informed decision whether to accept or reject a settlement offer. Therefore, Lubet's testimony that Lowrey would not collect a contingent fee or costs and expenses in the absence of a written contingent fee was relevant to the issue of whether Lowrey provided sufficient information to Mary in order for her to make an informed decision regarding settlement of the case. Accordingly, the trial court did not abuse its discretion by allowing Lubet to testify regarding the missing contingent fee agreement.

Finally, the trial court issued a cautionary instruction to the jury prior to Lubet's testimony regarding the contingent fee agreement. Specifically, the trial court cautioned the jury that it was allowing Lubet to testify regarding the contingent fee agreement for the limited purpose of indicating what amount of money might have come out of the $1 million settlement offer for legal fees, costs, and liens, and that this had to be communicated to Mary in order for her to make an informed decision whether to accept or reject a settlement offer. We find that the trial court's cautionary instruction cured any possible prejudice resulting from testimony regarding the missing contingent fee agreement. See *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d 149, 180

1-05-3686

(2003) (trial court's admonition and cautionary instruction cured any prejudice from improper remark).

Defendants next claim that they are entitled to a new trial because the trial court abused its discretion by erroneously giving the jury a missing evidence jury instruction (Illinois Pattern Jury Instructions, Civil, No. 5.01 (2006) (hereinafter IPI Civil (2006) No. 5.01)) relating to the missing contingency fee agreement. Defendants claim that the instruction was prejudicial and denied defendants a fair trial because the instruction permitted the jurors to infer that some aspect of the fee agreement was adverse to Lowrey.

An IPI Civil (2006) No. 5.01 instruction allows the jury to infer that any evidence not offered but within the control of a party is adverse to that party. *Singh v. Air Illinois, Inc.*, 165 Ill. App. 3d 923, 933 (1988). An IPI Civil (2006) No. 5.01 instruction is warranted where some foundation is presented on each of the following: "(1) the evidence was under the control of the party and could have been produced through the exercise of reasonable diligence; (2) the evidence was not equally available to the adverse party; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed the evidence to be in his favor; and (4) no reasonable excuse for the failure [to produce the evidence] has been shown." *Jenkins v. Dominick's Finer Foods, Inc.*, 288 Ill. App. 3d 827, 831 (1997). However, IPI Civil (2006) No. 5.01 is not warranted where missing evidence is merely cumulative of facts already in evidence. *Jenkins*, 288 Ill. App. 3d at 831.

In the present case, Lowrey testified that there was a signed written contingency fee agreement and that it was in his possession. This established that the agreement was in Lowrey's

-40-

control and that he could have produced it with the exercise of due diligence. Further, Lowrey's testimony that he had the contract after it was signed and that he did not have any transmittal letters or written acknowledgment indicating that he sent Mary a copy of the agreement established that the evidence was not equally available to plaintiff. Defendants do not contest the establishment of the third criteria that a reasonably prudent person under similar circumstances would have produced the evidence if it would have been favorable to him. Finally, the foundation for the fourth element was established when Lowrey testified that he did not know what happened to the signed agreement. In light of the foregoing, we find that the trial court did not abuse its discretion in issuing IPI Civil (2006) No. 5.01.

Defendants also claim that they are entitled to a new trial because the trial court erroneously allowed testimony of the possibility of a settlement for over $1 million. Defendants claim that this testimony was purely speculative and that it was prejudicial because it suggested to the jury that plaintiff would have received more than $1 million had defendants more effectively negotiated the case.

We initially note that defendants have waived this contention by failing to comply with Supreme Court Rule 341(h)(7). Here, defendants contend that the trial court should not have allowed testimony that the medical malpractice case could have settled for more than $1 million. However, defendants have failed to cite to any pages of the record or to specify whose testimony or argument they are referring to. Under these circumstances, we cannot determine the precise source of defendants' contention. Defendants' failure to properly present this issue or cite to pages of the record relied upon violates Supreme Court Rule 341(h)(7) and results in waiver of

their contention on appeal. *Elder*, 324 Ill. App. 3d at 533.

Defendants have also waived this contention by failing to object to the disputed evidence when it was introduced at trial. The record shows that defendants raised this issue prior to trial in a motion *in limine*, seeking to bar any testimony or argument that the underlying medical malpractice case would have settled for more than $1 million. The trial court denied defendants' motion. However, " '[T]he denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial. The moving party remains obligated to object contemporaneously when the evidence is offered at trial.' " *Krklus v. Stanley*, 359 Ill. App. 3d 471, 486 (2005), quoting *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994). The record here shows that defendants failed to object to the disputed testimony when it was introduced at trial. Specifically, without objection from defendants, Lowrey testified that prior to trial in the medical malpractice case, he "figured" that defendants had more than $1 million available to settle the case. Defendants' failure to make a contemporaneous objection to this testimony results in waiver of this issue on appeal. *Krklus*, 359 Ill. App. 3d at 486; *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896, 904 (1997).

Waiver aside, defendants' contention fails on the merits. The record shows that the trial court did not allow testimony that could have established that the medical malpractice case could have settled for more than $1 million. Specifically, the trial court sustained defendants' objection when plaintiff's counsel asked Reiter if the medical malpractice case could have settled for more than $1 million. The only evidence on this subject that the trial court allowed was Lowrey's testimony that he "figured" the medical malpractice defendants had more than $1 million to settle

1-05-3686

the case. Lowrey's testimony went to the issue of whether he communicated that belief to Mary and whether he provided her with sufficient information to make an informed decision regarding settlement. However, that testimony did not establish that the case could have settled for more than $1 million.

Finally, defendants were not prejudiced by the testimony regarding settlement of more than $1 million. Had the jury in this case returned a verdict for more than $1 million, then defendants could plausibly argue that the jury might have been influenced by the disputed testimony. However, the jury awarded plaintiff only $1 million, and, under the circumstances presented here, we cannot say that Lowrey's testimony influenced the jury or prejudiced defendants.

Defendants further claim that they are entitled to a new trial because the trial court made improper comments to plaintiff's expert, Professor Lubet. Defendants claim that the trial court's comments denied them a fair trial by bolstering Lubet's credibility and destroying any progress made by defense counsel during Lubet's cross-examination.

The record shows that at the conclusion of Lubet's testimony, in the presence of the jury, the trial judge had the following exchange with Professor Lubet:

"THE COURT: When did you start at Northwestern?

THE WITNESS: 1975.

THE COURT: That's when my son was there.

THE WITNESS: I taught your son.

THE COURT: I just wanted to make it clear.

-43-

THE WITNESS: Thank you, Your Honor.

THE COURT: My son's a very ethical lawyer.

THE WITNESS: I did my job."

We initially note that although defendants did not object to the court's comments during trial or raise this issue in his posttrial motion, the waiver rule is relaxed where the basis of the objection is the trial judge's conduct. See *People v. Nevitt*, 135 Ill. 2d 423, 455 (2000). Accordingly, we consider the merits of defendants' contention.

A trial court has wide discretion in conducting a trial, but the court may not interject comments or opinions indicating its opinion on the credibility of a witness or the argument of counsel. *People v. Enoch*, 189 Ill. App. 3d 535, (1989). However, to constitute reversible error, defendants must show that they were harmed by the remarks and that the remarks were prejudicial. *People v. Heidorn*, 114 Ill. App. 3d 933, 938 (1983).

After careful review, we conclude that the trial court's comments did not improperly bolster Lubet's credibility. The trial judge's dialogue with Lubet was brief, and at no point did the court comment on Lubet's testimony or his general credibility as a witness. Contrary to defendants' argument, the court's comments also did not imply that Lowrey acted unethically or that Lubet was a more reliable witness than Lowrey or Lavin. Ambiguous comments such as those made by the trial court in this case generally do not constitute prejudicial error. *Heidorn*, 114 Ill. App. 3d at 938.

Defendants finally claim that they are entitled to a new trial because the verdict was against the manifest weight of the evidence. Defendants assert that the verdict was against the

manifest weight of the evidence because there was no evidence of a standard of care, a breach of that standard, damages, or proximate cause. We observe that, as defendants themselves acknowledge, this contention is simply a reiteration of the arguments that defendants have already raised on appeal, except that those arguments are now being offered as reasons why the trial court erred in denying defendants' motion for a new trial.

In considering whether a motion for a new trial should be granted, the trial court should set aside a jury's verdict only if it was contrary to the manifest weight of the evidence, which occurs " 'where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary and not based upon any of the evidence.' " *Maple*, 151 Ill. 2d at 454, quoting *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089 (1990). A new trial should not be granted merely because some evidence is conflicting. *Villa*, 202 Ill. App. 3d at 1089. A reviewing court should be mindful that when the trial court ruled on the motion for a new trial, it had the benefit of " ' "previous observation of the appearance of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility." ' " *Maple*, 151 Ill. 2d at 456, quoting *Buer v. Hamilton*, 48 Ill. App. 2d 171, 174 (1964), quoting *Hulke v. International Manufacturing Co.*, 14 Ill. App. 2d 5, 47 (1957). This court, on review, should consider whether the jury's verdict was supported by the evidence and whether the losing party was denied a fair trial. *Maple*, 151 Ill. 2d at 455. A trial court's denial of a motion for a new trial will not be reversed on appeal except in those instances where it is affirmatively shown that the trial court abused its discretion. *Maple*, 151 Ill. 2d at 455.

Here, the issues before the jury were whether Lowrey communicated the settlement offer

to Mary and whether Lowrey provided her with sufficient information to make an informed decision regarding settlement of the medical malpractice case. Both parties presented competing experts who testified regarding the standard of care and how Lowrey either did or did not comply with that standard. As previously discussed, plaintiff presented Lubet's expert testimony that Lowrey breached the standard of care that he owed to Mary. Specifically, Lubet testified that Lowrey violated a number of duties to Mary if he did not tell her of the settlement offer until after he rejected it, and that, even if Lowrey did advise Mary of the offer, he nevertheless failed to provide her with sufficient information to make an informed decision. Defendants, on the other hand, presented Lavin's expert testimony that Lowrey's conduct, particularly as it related to settlement and communications with Mary, was "exactly what you would expect of a reasonably well qualified trial lawyer under [similar] circumstances."

Additionally, Mary testified that she first heard about the $1 million settlement offer when Lowrey told her that it had been offered and that he had already rejected it. Mary's testimony was supported by Reiter, the attorney who represented the hospital and doctor in the medical malpractice case, who testified that the trial court informed him that plaintiff had rejected the offer on the same day that it was made.

Lowrey, on the other hand, testified that he discussed the settlement offer with Mary the same day that the offer was made to him. Mary told him to reject the offer, and Lowrey did so the next day. Lowrey was unclear of when his conversation with Mary took place. After initially believing it took place in November 1996, he testified at trial that he spoke with her on the night of October 28, 1996, and rejected the offer the following day.

Having considered all the evidence presented by both sides, we cannot say that the jury's verdict in favor of plaintiff was against the manifest weight of the evidence. Although there were conflicts in the evidence presented at trial, the record contains ample evidence from which the jury could conclude that Lowrey violated the standard of care owed to the Kings. Because the jury's verdict was supported by the evidence, the trial court did not abuse its discretion when it denied plaintiff's motion for a new trial. Finally, we do not find any of the complained of events, either individually or cumulatively, warrant a new trial.

We next consider plaintiff's cross-appeal. Plaintiff first contends that the trial court erred by denying her request for prejudgment interest. Specifically, plaintiff claims that she is entitled to prejudgment interest under the Illinois Interest Act (the Act) (815 ILCS 205/0.01 *et seq.* (West 2004)), and on equitable grounds.

Generally, prejudgement interest is recoverable only where allowed by agreement of the parties or by statute. *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 255 (2006); *City of Springfield v. Allphin*, 82 Ill. 2d 571, 576 (1980). In this case, plaintiff first asserts that she is statutorily entitled to prejudgement interest under section 2 of the Act. That section provides that "[c]reditors shall be allowed to receive [interest] at the rate of five (5) per centum per annum for all moneys after they become due on any *** instrument in writing." 815 ILCS 205/2 (West 2004). To recover prejudgment interest under the Act, there must be a fixed or easily calculated amount due from a debtor-creditor relationship that has come into existence by virtue of a written instrument. *Adams v. American International Group, Inc.*, 339 Ill. App. 3d 669, 674 (2003). "Interest statutes *** are in derogation of the common law and must be strictly construed.

-47-

Nothing is to be read into them by intendment or implication." *Allphin*, 82 Ill. 2d at 577.

Plaintiff claims that the written contingency fee agreement was an "instrument in writing" under the Act, that defendants breached that agreement by failing to advise her of the $1 million settlement offer, and that the damages from that breach, the loss of the $1 million settlement offer, are easily calculable.

We find that the section 2 of the Act does not apply to plaintiff's claim for prejudgment interest. We recognize that a written contingent fee agreement has been found to constitute an "instrument in writing" for purposes of the Act. See *Krantz v. Chessick*, 282 Ill. App. 3d 322, 328 (1996) (finding that a contingent fee agreement was an instrument in writing within the meaning of the interest statute). However, in this case, plaintiff has consistently asserted that there was no written contingency fee agreement between the parties, and neither plaintiff nor defendant produced such a written and signed agreement at trial. In this regard, we note that plaintiff does not now contend or provide authority stating that an oral agreement satisfies the "instrument in writing" requirement of section 2 of the Act. Moreover, assuming there was a written agreement between plaintiff and defendants, that agreement must obligate defendants to pay money to plaintiff. See 815 ILCS 205/2 (West 2004) ("Creditors shall be allowed to receive [interest] for all *moneys after they become due on any *** instrument in writing ***"* (emphasis added)). In this case, there is no evidence before us to suggest that the contract between the parties required defendants to pay any sum of money to plaintiff. See *Adams*, 339 Ill. App. 3d at 674 (finding that a release entered into as part of a settlement agreement did not establish a debtor-creditor relationship and thus qualify as an instrument in writing because the obligation to pay arose out of

an oral settlement agreement rather than the release). Finally, the Act provides for interest on money *after* it has become due. See 815 ILCS 205/2 (West 2004). In this case, plaintiff was not due $1 million until after judgement was entered in her favor and against defendants. Under these circumstances, we conclude that section 2 of the Act does not provide plaintiff with a statutory basis upon which to seek prejudgment interest.

Plaintiff relies on *Krantz* in support her assertion that the contingent fee agreement in this case was an instrument in writing for purposes of the Act. In *Krantz*, plaintiffs hired defendant, an attorney, to prosecute a claim on their behalf. Both plaintiffs executed a written contingency agreement which stated, in part, that they agreed to pay the defendant for his services a sum equal to 33 1/3% of any amount received on their claims at trial or by settlement. In addition, plaintiffs would reimburse defendant for " 'all reasonable and necessary advances, costs and expenses, if any, paid or incurred by the law office.' " *Krantz*, 282 Ill. App. 3d at 324. The case ultimately settled, and defendant attempted to give each plaintiff a check for his or her portion of the settlement, minus unpaid costs. Plaintiffs refused to accept the check based on their belief that they were entitled to additional funds. Defendant thereafter deposited the settlement proceeds into a trust account, and plaintiffs subsequently filed suit against defendant to recover the settlement proceeds. *Krantz*, 282 Ill. App. 3d at 325.

At trial, defendant claimed that he and one of the plaintiffs orally agreed that if the court made an award of attorney fees under section 1988 of the federal civil rights law (42 U.S.C. §1988 (1994)), then defendant's law firm would be entitled to those fees in lieu of the one-third contingency fee. *Krantz*, 282 Ill. App. 3d at 325. That plaintiff claimed at trial that there was no

1-05-3686

discussion regarding attorney fees prior to execution of the written contract and that there was never an agreement that respondent was to get section 1988 attorney fees. The trial court determined that the parties did not enter into an oral agreement regarding attorney fees and that the written retainer contract governed the terms of the attorney-client relationship. *Krantz*, 282 Ill. App. 3d at 326. The court awarded plaintiffs the amount of the settlement offer, minus the contingency fee and expenses, and prejudgment interest.

Defendant appealed and argued that the prejudgment interest was improper because the funds were unliquidated and because he acted in good faith. The *Krantz* court analyzed section 2 of the Interest Act and determined that the contingency-fee agreement was an instrument in writing within the meaning of the interest statute, that the amounts due to plaintiffs were easily calculable, and that prejudgment interest was appropriate under the circumstances of the case. *Krantz*, 282 Ill. App. 3d at 328. The court reasoned that because there was no agreement that respondent would be entitled to section 1988 attorney fees in lieu of the one-third contingency amount, defendant had no justification to retain more of the settlement than what was owed under the contingency-fee agreement. *Krantz*, 282 Ill. App. 3d at 328. Accordingly, the court held that plaintiffs were entitled to an equitable award of prejudgment interest on the entire balance owed to them. *Krantz*, 282 Ill. App. 3d at 328.

We find that *Krantz* is easily distinguishable from the present case. In this case, unlike in *Krantz*, the parties dispute whether there was a written, signed contingency fee agreement. As noted, plaintiff has consistently maintained that there was no such written agreement, and neither party produced such a written and signed contract at trial. Moreover, unlike the defendant in

*Krantz*, defendants in this case did not accept a settlement check and then retain funds from that settlement that rightfully belonged to plaintiff. We also note that although the court in *Krantz* found that the contingent agreement was an instrument in writing, the court ultimately held that plaintiffs were entitled to an *equitable* award of prejudgment interest. See *Krantz*, 282 Ill. App. 3d at 328 ("We hold that petitioners are entitled to an equitable award of prejudgment interest"). Under these circumstances, we conclude that *Krantz* does not support plaintiff's claim that she is entitled to prejudgment interest under section 2 of the Act.

In the alternative, plaintiff claims that she is entitled to prejudgment interest based on equitable considerations. As previously noted, prejudgment interest is not allowed absent a statute or agreement between the parties. *Tri-G, Inc.*, 222 Ill. 2d at 257. However, an exception to this rule exists in equity. " 'In chancery proceedings, the allowance of interest lies within the sound discretion of the judge and is allowed where warranted by equitable considerations and disallowed if such an award would not comport with justice and equity.' " (Emphasis omitted.) *Tri-G, Inc.*, 222 Ill. 2d at 257, quoting *Allphin*, 82 Ill. 2d at 579; see also *In re Estate of Wernick*, 127 Ill. 2d 61, 87 (1989) (observing that equitable principles "dictate that when money has been wrongfully withheld the victim receive interest for the wrongdoer's retention of his money"). The availability of equitable relief, however, does not depend on whether the case is proceeding in either the law or the chancery division of the circuit court. *Tri-G, Inc.*, 222 Ill. 2d at 257-58. Rather, it is the substance of the claim being asserted that determines the appropriate relief and the character of the court. *Continental Casualty Co. v. Commonwealth Edison Co.*, 286 Ill. App. 3d 572, 579 (1997); *Tri-G, Inc.*, 222 Ill. 2d at 258.

1-05-3686

In this case, plaintiff's legal malpractice action was entirely an action at law. See *Tri-G, Inc.*, 222 Ill. 2d at 258 (characterizing legal malpractice action as an action at law); 65A C.J.S. *Negligence* §649 (2000) (stating that negligence is an action at law); *Cook v. Gould*, 109 Ill. App. 3d 311, 314 (1982) (stating that legal malpractice action is no different than cause of action for ordinary professional negligence). Additionally, although plaintiff claims that the jury verdict encompassed a finding of breach of contract, that, too, is a "classic action at law." *Continental Casualty Co.*, 286 Ill. App. 3d at 579. " 'Illinois courts have declined to apply the rule governing equitable awards of prejudgment interest to cases at law, notwithstanding that an injured party who is eventually compensated may suffer detriment from the inability to use the money from the date of loss to the date of compensation.' " *Tri-G, Inc.*, 222 Ill. 2d at 258, quoting *Continental Casualty Co.*, 286 Ill. App. 3d at 579; see also *Wilson v. Cherry*, 244 Ill. App. 3d 632, 640 (1993) ("Illinois does not *** permit the award of prejudgment interest in suits for recovery for negligence"). We likewise decline to extend the rule governing equitable awards of prejudgment interest to this case and therefore find that plaintiff is not entitled to an equitable award of prejudgment interest. Accordingly, the trial court did not err in denying plaintiff's request for statutory and equitable prejudgment interest.

Plaintiff also contends that the trial court erred by denying her request for attorney fees and costs. The basis for plaintiff's claim is that prior to trial she submitted certain requests to defendants to admit facts. Defendants denied some of these requests, and plaintiff now asserts that she established the truth of these matters at trial and that she should therefore be awarded expenses and fees pursuant to Supreme Court Rule 219(b) (210 Ill. 2d R. 219(b)).

1-05-3686

Supreme Court Rule 219(b) governs the imposition of sanctions resulting from a party's refusal to admit a particular fact. Rule 219(b) provides:

> "Expenses On Refusal To Admit. If a party, after being served with a request to admit the genuineness of any documents or the truth of any matters of fact, serves a sworn denial thereof, and if the party requesting admissions thereafter proves the genuineness of the document or the truth of the matter of fact, the requesting party may apply to the court for an order requiring the other party to pay the requesting party the reasonable expenses incurred in making the proof, including reasonable attorney's fees. Unless the court finds that there were good reasons for the denial or that the admissions sought were of no substantial importance, the order shall be made."
>
> 210 Ill. 2d R. 219(b).

The imposition of Rule 219(b) sanctions is a matter within the broad discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of discretion. *Case v. Forloine*, 266 Ill. App. 3d 120, 129 (1993).

We consider each group of requests to admit as they are raised by plaintiff on appeal. Requests to admit Nos. 26, 28 and 38 essentially asked defendants to admit that Lowrey rejected the $1 million settlement offer before communicating that offer to Mary or anyone acting on Jordan's behalf. Defendants denied these requests, and plaintiff now claims this denial was unreasonable. However, plaintiff's case against defendants was largely based on Lowrey's alleged

-53-

failure to communicate the existence of a settlement offer to Mary before rejecting it. Defendants' position at trial was that not only did Lowrey communicate the offer to Mary, but that Mary was the one who rejected it. Therefore, defendants' admission of these facts would have conceded away their entire case. We do not believe that this is the intent of Rule 219(b).

As we explained in *Exchange National Bank of Chicago v. DeGraff*, 110 Ill. App. 3d 145, 162 (1982), "if [Rule 219(b)] is extended to all controverted matters which become 'proven facts' only through a general verdict or judgment, the prevailing party to an action would presumably be allowed to recover fees and expenses routinely. We do not believe this is the intent of Supreme Court Rule 219(b)." In that case, we held that the defendant had good reason to deny certain of plaintiff's request to admit because the admission of those requests would have "conceded away its whole case." *Degraff*, 110 Ill. App. 3d at 162; accord *Chem-Pac, Inc. v. Simborg*, 145 Ill. App. 3d 520, 526 (1986) (finding that defendants had good reason to refuse to admit plaintiff's allegations because defendants were not required to admit liability). Likewise, in this case, defendants were not required to admit liability, and we therefore find that defendants had good reason to deny these requests.

Requests to admit Nos. 31 through 36 asked defendants to admit that, after Donald King's death, Mary was the only person authorized to act on Jordan's behalf. Defendants denied these requests and now assert that Mary's father, Jerry Urbik, as well as numerous witnesses hired by defendants, acted on Jordan's behalf as well. We find that these requests lack substantial importance, as there was no issue raised at trial as to whether anyone other than Mary was authorized to act of Jordan's behalf. See *Degraff*, 110 Ill. App. 3d at 162 (noting that Rule 219(b)

requires the matters sought by the requests to be of substantial importance, and finding that, in that case, plaintiff's denial of certain requests did not warrant imposition of costs and fees because those requests "lack[ed] substantial importance").

Requests to admit Nos. 39 through 44 asked defendants to admit that Lowrey owed Jordan King a fiduciary and contractual duty to communicate all settlement offers and to obtain authority before accepting or rejecting any settlement. However, defendants' position during trial was that the law did not require Lowrey to convey unreasonable settlement offers and that Lowrey only had a duty to "reasonably communicate" with the client. Therefore, defendants would have conceded this defense had they admitted the matters sought in these requests. Again, we do not believe that Rule 219(b) was intended to require these types of admissions from defendants. See *Degraff*, 110 Ill. App. 3d at 162. Moreover, we cannot conclude that plaintiff has proved the truth of the matters sought in these requests, as the jury was not asked to decide whether Lowrey owed Jordan a duty to convey every settlement offer.

Requests to admit Nos. 75 through 86 asked defendants to admit that, had Lowrey communicated to anyone acting on Jordan King's behalf that $1 million or more was available to settle the case, he would have been instructed to settle the case and to do so at the highest possible amount. However, defendants maintained throughout trial that Lowrey communicated the $1 million settlement offer to Mary, and that she told him to reject it. Defendants also maintained that a reasonable person would not have accepted the settlement offer because it was inadequate to cover the costs of Jordan's care. Again, Rule 219(b) does not require defendants to have made these admissions because doing so would have conceded their entire case. See *Degraff*, 110 Ill.

App. 3d at 162. Moreover, as we noted in *DeGraff*, Rule 219(b) "applies most logically to matters within the denying party's control or knowledge which may be subsequently verified by independent sources, as for example, a party's income or the existence of a cloud on a party's real estate title." *DeGraff*, 110 Ill. App. 3d at 162. Here, the admissions that plaintiff sought would have required speculation by defendants, and we do not believe that the matters raised in these requests were within defendants' knowledge and able to be subsequently verified by independent sources. Accordingly, we do not find that defendants' denial of these requests was unreasonable.

Requests to admit Nos. 103 through 106 asked defendants to admit that Lowrey never asked or arranged to have a guardian *ad litem* appointed in the medical malpractice case for the purpose of evaluating any settlement offer. These requests, however, sought admissions that lack substantial importance because there was no issue raised as to whether a guardian *ad litem* was appointed and whether Lowrey sought to have a guardian *ad litem* appointed had no bearing on whether defendants were liable to plaintiff. Moreover, guardians *ad litem* are typically appointed in situations where the parent is being unreasonable with respect to settling a case, and defendants' position throughout trial was that Mary agreed with Lowrey that the $1 million offer should be rejected. Accordingly, we find that defendants had good reason to deny these requests.

Requests to admit Nos. 107 through 110 asked defendants to admit that Lowrey failed to send correspondence to Mary regarding any settlement offer. Defendants denied this request, and plaintiff now claims that "[Lowrey's] own file proved that he had not." However, we do not have the "file" that plaintiff refers to. Moreover, Rule 219(b) requires that the party requesting the admissions must thereafter prove the truth of the matter asserted. See 210 Ill. 2d R. 219(b).

Based upon the record before us, we have no basis to conclude that plaintiff proved that Lowrey never sent correspondence to Mary regarding settlement. Therefore, we find that defendants' denial of these requests was not unreasonable.

Finally, plaintiff contends that defendants improperly denied the second set of requests to admit Nos. 8, 9, 13, 34, 36 through 38, and 40. These requests essentially asked defendants to admit that they had no documents regarding a signed contingent fee agreement, the communication of settlement offer or their rejection, or the reimbursement of defendants' costs and expenses.

We find that plaintiff has waived this contention by failing to comply with Supreme Court Rule 341(h)(7). Plaintiff has taken eight distinct requests to admit and grouped them under a single claim that they were improperly denied. Plaintiff has done so without any analysis as to how each of these particular requests was improperly denied or how she subsequently proved the matter asserted in these requests. As previously noted, " '[a] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *In re Marriage of Auriemma*, 271 Ill. App. 3d at 72, quoting *Thrall Manufacturing Co.*, 145 Ill. App. 3d at 719. An issue not clearly defined and sufficiently presented fails to satisfy the requirements of Supreme Court Rule 341(h)(7) and is therefore waived. *Vincent*, 183 Ill. App. 3d at 1087. In light of plaintiff's failure to sufficiently present this issue, we find that it is waived.

For the reasons stated, we affirm the judgment of the circuit court of Cook County.

Affirmed.

1-05-3686

CAHILL and R. GORDON, JJ., concur.